# IN THE SUPREME COURT OF IOWA

No. 15–1807

Filed May 25, 2017

**STATE OF IOWA,**

Appellee,

vs.

**JESUS ANGEL RAMIREZ,**

Appellant.

---

Appeal from the Iowa District Court for Black Hawk County, George L. Stigler, Judge.

The defendant appeals his convictions following a jury trial on drug offenses, arguing among other things that the results of a search performed under a federal search warrant should have been suppressed. **AFFIRMED.**

David A. Cmelik of David A. Cmelik Law PLC, Hiawatha, for appellant.

Thomas J. Miller, Attorney General, Genevieve Reinkoester, Assistant Attorney General, Brian Williams, County Attorney, and Brad Walz, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

Federal agents intercepted a package containing a hidden cache of methamphetamine as it entered this country from Mexico. A federal agent then decided to make a controlled delivery of the package to its intended recipient in Waterloo, Iowa. He obtained from a federal magistrate judge a federal "anticipatory" search warrant authorizing a search to be conducted once the package reached its intended recipient.

With assistance from local law enforcement, federal agents proceeded with the controlled delivery. The recipient of the package was detained and federal agents searched his apartment. Ultimately, the federal government decided to turn the case over to Iowa for prosecution, and the recipient of the package was convicted in the Black Hawk County District Court of possession of methamphetamine with intent to deliver and drug stamp violations. *See* Iowa Code § 124.401(1)(*b*)(7); *id.* § 453B.12 (2014).

The defendant now appeals, arguing among other things that Iowa's search warrant statutes do not authorize anticipatory warrants. We agree, but hold that where the federal government conducts a search pursuant to a valid federal search warrant for purposes of a federal investigation, the mere fact that such a warrant would not have been statutorily authorized in Iowa does not compel the results of the search to be suppressed in the Iowa courts. For this reason, and because we also find the defendant's other claims of error to be without merit, we affirm the defendant's conviction and sentence.

## I. Background Facts and Proceedings.

On May 15, 2014, a package shipped from Mexico and destined for Waterloo arrived in this country at the FedEx hub in Memphis, Tennessee. It was addressed to Jessy Robles, 1013 Mulberry Street,

Waterloo, and contained a phone number for contact purposes with a 319 area code.

United States Customs and Border Protection (CBP) officers opened and inspected the parcel on arrival in Memphis. They found that it contained three heavy mirrors. Inside the mirror frames they discovered approximately one to two pounds of an unknown white substance. Upon field testing, the substance turned out to be methamphetamine.

A CBP officer in Memphis contacted Tyler Mower, a Homeland Security Investigations (HSI) special agent based in Cedar Rapids. HSI is part of the United States Department of Homeland Security and investigates "anything that comes in or out of the country illegally." Mower agreed to perform a controlled delivery of the package to its intended recipient. Accordingly, the package was forwarded by FedEx to Mower's office in Cedar Rapids.

Once Agent Mower received the package, he and other HSI agents reopened and reinspected it. The declared value of the mirrors was $90, whereas Mower determined from FedEx that the shipping charge alone would have been between $170 and $225. The HSI agents confirmed the presence of the methamphetamine.

Mower performed a records check through Waterloo police. He determined that an individual named Jesus Angel Ramirez, currently on parole, had the same cell phone number listed as the contact number on the package and lived at 1013 Mulberry Street, #2. Additionally, the records check revealed that Ramirez used several different aliases including Jose Robles and Jesse Ramirez.

Agent Mower decided that Ramirez was the intended recipient of the package and made plans to proceed with the controlled delivery. On

May 16, Mower applied for an anticipatory search warrant with the United States District Court for the Northern District of Iowa. The application was reviewed by a federal magistrate judge in Cedar Rapids and approved at approximately 10:21 a.m. The warrant was based on the following condition precedent:

### CONDITION PRECEDENT FOR ANTICIPATORY SEARCH WARRANT[ ]

. . . The search warrant will be executed only upon satisfaction of a condition precedent described as follows: The parcel will be delivered to 1013 Mulberry Street, Apartment 2, Waterloo, Iowa, with delivery being completed only when accepted by a person. The package will not be left on the porch or outside this residence. Once delivery of the parcel has been accepted by a person, I believe probable cause exists to believe the items listed on Attachment B will be located in 1013 Mulberry Street, Apartment 2, and the condition precedent for executing the search warrant will have been met.

After obtaining the search warrant, Mower and three other HSI agents drove from Cedar Rapids to Waterloo with the package, which they had repacked. A postal inspector also placed a transmitter inside the package that would alert agents once the package had been opened. In Waterloo, the HSI agents met with members of the Tri-County Drug Enforcement Task Force, a group of state law enforcement officials, to assist with the controlled delivery. These members included Jason Feaker, the lieutenant in the Waterloo police department whom Mower had spoken with when performing the records check the previous day.

It was determined that Nicholas Berry, a Waterloo police officer and member of the task force, would pose as a FedEx delivery person and make the actual delivery. Meanwhile, the HSI agents and other members of the Tri-County Task Force would perform surveillance.

That afternoon, Berry walked into the apartment building and knocked on the door of Apartment #2, the closest door to the building's

main entrance. A man opened the door, indicated he was expecting the package, and confirmed to Berry that he was Robles, later identified as the defendant, Jesus Ramirez. Ramirez accepted the package and signed for it as "Jesse Robles" on a waybill used by Officer Berry. Berry then left the apartment building.

The plan had been to wait for the transmitter in the package to be triggered. Within a few minutes, though, Ramirez was spotted exiting the apartment, walking around to the front of the apartment, looking around, and then returning inside. A woman was observed leaving the apartment around the same time. Several minutes later, Ramirez again came out of the apartment, taking a bag of trash to a dumpster. Shortly after that, Ramirez departed from the apartment a third time and began walking toward downtown Waterloo.

Two HSI agents followed Ramirez and detained him. Ramirez was later placed under arrest and Mirandized. When questioned, Ramirez denied knowing anything about the package even when confronted with the facts that he had signed for it and his name and phone number were listed on the package.

Once Ramirez had been detained, Mower decided to execute the warrant. Task Force members had been assigned to do the initial entry. They approached the apartment, announced their presence, and forced their way in. They found the apartment empty and the package sitting on a bed, unopened. After the Task Force members had secured the residence, HSI agents conducted the search pursuant to the warrant. HSI agents seized various documents connecting Jose Robles and Jesus Ramirez to the 1013 Mulberry, Apartment #2 residence. One of the documents also showed Ramirez as having the same 319 area code number contained on the FedEx package.

Other than the package itself, HSI took the items seized pursuant to the warrant into its custody. HSI allowed the package and its contents to be turned over to the Task Force so testing could be performed by the Iowa Division of Criminal Investigation. Almost one kilogram of methamphetamine was eventually recovered from inside the mirror frames.

At some point, the United States Attorney's Office decided to let the State of Iowa prosecute the case. On May 27, a trial information was filed in the Black Hawk County District Court charging Ramirez with possession of methamphetamine with intent to deliver, a class "B" felony in violation of Iowa Code section 124.401(1)(*b*)(7), and drug tax stamp violation, a class "D" felony in violation of Iowa Code section 453B.12. Because Ramirez had prior convictions for possession with intent to deliver methamphetamine and marijuana, his sentence on the methamphetamine charge was subject to enhancement. *See* Iowa Code § 124.411(1). Ramirez pled not guilty and filed a written arraignment on June 6.

Ramirez filed a motion to suppress, claiming the initial search of the package and the validity and execution of the search warrant violated his rights under the United States and Iowa Constitutions as well as Iowa Code chapter 808.[1] Following an evidentiary hearing, the district court denied the motion to suppress. After a change of counsel, Ramirez then filed a motion for reconsideration of the suppression ruling. In that motion, he claimed that an anticipatory warrant, like the one issued to Agent Mower in this case, was invalid under Iowa Code chapter 808 and

---

[1]The issues raised by Ramirez in this motion to suppress were not advanced on appeal.

therefore suppression was required. *See State v. Gillespie,* 530 N.W.2d 446, 449 (Iowa 1995). The court disagreed, concluding:

> Defendant's Application for Reconsideration is premised upon case law stating quite clearly that Iowa does not permit anticipatory search warrants. The search warrant herein was issued to a federal law enforcement agent by a federal judge and executed by federal agents with the assistance of Iowa law enforcement. None of the cases cited by the defense would mean, to the court's observation, that Iowa's prohibition[] on anticipatory search warrants would apply in this case.

On May 22, 2015, Ramirez waived in writing his right to a speedy trial within one year of arraignment. *See* Iowa R. Crim. P. 2.33(2)(c).

Ramirez's case proceeded to trial in September. During Berry's testimony, the State offered as an exhibit the audio recording of the conversation that had occurred between Berry and Ramirez during the controlled delivery. Ramirez objected that portions of the recording had been deleted or altered, a contention disputed by the State. The court overruled the objection and admitted the recording. The recording was then played for the jury.

At the conclusion of Berry's testimony, Ramirez clarified his objection outside the presence of the jury:

> The copy of the audiotape that I had received contained a lot of what was on that recording. However, the recording that I received from the police department, although it says it's a certified copy, does not have those last 15 or 20 seconds of the conversation between Investigator Berry and other members of the people that were conducting surveillance with regards to the property.
>
> Specifically, when one of the persons on the radio indicated they saw a woman in white leaving the apartment, that was not included in the copy of the audiotape that we had received.

In other words, Ramirez's concern was that the version played for the jury included an additional fifteen or twenty seconds at the end that had

not appeared on the version that Ramirez received in discovery—although this material related to subsequent surveillance discussion among the law enforcement agents, not to the actual controlled delivery.

Although the court agreed Ramirez should have been provided the full audio recording, it found that nothing in the additional material at the end would either exonerate or inculpate Ramirez, nor would its contents have come as a surprise to him. The court emphasized that Ramirez had received a complete copy of the actual conversation between himself and Officer Berry, which it described as "the critical situation."

Later in the trial, a CD of photographs taken by HSI agent Stephen Allen was admitted into evidence without objection. The photographs depicted the package both as it arrived to the HSI office in Cedar Rapids and later as it appeared in the apartment when the search warrant was executed.

After Allen finished testifying, Ramirez's counsel informed the court that out of the approximately twenty or twenty-five photographs contained on the disk, and shown to the jury, Ramirez had received only three of them on the zip file emailed to his counsel as part of the prosecution's pretrial disclosures. Ramirez claimed that his inability to review the remaining photographs before trial had put him at a disadvantage and moved for a mistrial. The trial court declined to declare a mistrial, again similarly acknowledging that while Ramirez should have received all the photographs, he could not demonstrate any resulting prejudice.[2]

---

[2]The State maintained that whether or not the photographs were missing from the zip file, they would have been available for review at the prosecutor's office pursuant to the county attorney's open-file policy in criminal cases.

At the close of the State's evidence, Ramirez moved for judgment of acquittal. The court denied the motion. The case was submitted to the jury, which found Ramirez guilty on both charges.

Following the trial, Ramirez filed a motion in arrest of judgment and a motion for a new trial. The trial court denied the motions prior to sentencing. The court imposed a fifty-year indeterminate sentence on the possession with intent to deliver methamphetamine offense and a five-year indeterminate sentence on the drug tax stamp violation, with the sentences to run consecutive to one another.

Ramirez appealed, raising four issues: (1) whether his trial counsel had been ineffective for failing to move to dismiss the trial information following a one-year speedy trial information, (2) whether the evidence was sufficient to sustain his conviction, (3) whether his motion to suppress should have been granted because Iowa law does not authorize anticipatory warrants, and (4) whether the district court abused its discretion in his denying his motions for mistrial and for a new trial. We retained the appeal.

## II. Standard of Review.

Because Ramirez's speedy trial claim is raised in the context of an ineffective-assistance-of-counsel claim, our review is de novo. *In re Detention of Blaise*, 830 N.W.2d 310, 315 (Iowa 2013). Sufficiency of evidence claims are reviewed for correction of errors at law, and we will uphold a verdict if substantial evidence supports it. *State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* at 704–05 (quoting *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014)). We review a district court's denial of a mistrial based on late disclosure of

evidence for abuse of discretion. *State v. Piper*, 663 N.W.2d 894, 901 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010).

Ramirez argues that the anticipatory federal search warrant in this case would not have been authorized under Iowa search warrant statutes. In Ramirez's view, use of evidence obtained from a warrant that did not meet state statutory standards resulted in a constitutional violation. Ramirez thus urges we should review the matter de novo whereas the State argues we should review for correction of errors at law. *Compare State v. Breuer*, 808 N.W.2d 195, 197 (Iowa 2012) (reviewing de novo a constitutional challenge to a search conducted pursuant to warrant), *with State v. Beckett*, 532 N.W.2d 751, 753 (Iowa 1995) (reviewing for correction of errors at law when the defendant "challenges only the statutory sufficiency of the warrant and not its constitutional validity"). Because it does not affect our decision, we accept Ramirez's position for purposes of this appeal and perform a de novo review.

**III. Analysis.**

**A. Other Issues.** To begin, we will address Ramirez's other issues. We will then turn to the search-and-seizure question that we think represents the heart of this appeal.

We do not find that Ramirez's trial counsel was ineffective in allowing him to sign a waiver of the one-year speedy trial deadline on May 22, 2015. At that time, a year had not passed since Ramirez's "initial arraignment pursuant to rule 2.8." Iowa R. Crim. P. 2.33(2)(*c*). Although the waiver referred to "initial appearance," the relevant date for purposes of this rule is the initial arraignment on the trial information, which occurred on June 6, 2014. *See State v. Hempton*, 310 N.W.2d

206, 207–08 (Iowa 1981) (finding that the one-year period starts with arraignment). Less than a year had elapsed.

We also find sufficient evidence to sustain Ramirez's convictions. The package, which contained a large quantity of methamphetamine, was addressed personally to Ramirez at his address. It also listed his cell phone number. Ramirez accepted and signed for the package while acknowledging that he was expecting a delivery. Ramirez then surveyed the scene around his apartment, seemingly to make sure he wasn't being watched by anyone. When Ramirez was arrested, he falsely denied knowing anything about the package. A reasonable jury could find that Ramirez possessed the methamphetamine with intent to deliver it.

Nor do we conclude that the district court abused its discretion in denying a mistrial or a new trial based on deficiencies in the State's pretrial disclosures. The missing fifteen to twenty seconds of audiotape on the copy produced to Ramirez's counsel did not concern the delivery itself and were not consequential. Any failure to produce certain photographs of the package did not prejudice Ramirez either. As Ramirez's own counsel acknowledged, "[A] lot of these photographs are fairly routine in nature and describe mostly what was being testified to previously." The essential facts were undisputed: methamphetamine had been packed inside metal mirror frames in Mexico, a package was addressed to Ramirez and sent via FedEx, Ramirez took delivery of the package but had not opened it at the time of his arrest.

**B. The Search of the Apartment.** This brings us to the central issue in the case, whether the district court should have granted Ramirez's motion to suppress the results of a search conducted pursuant to a federal warrant where the warrant was valid under federal law but would not have been valid under state law.

The warrant here was an anticipatory search warrant—that is, "a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." *United States v. Grubbs*, 547 U.S. 90, 94, 126 S. Ct. 1494, 1498 (2006) (quoting 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.7(c), at 398 (4th ed. 2004)). "Most anticipatory warrants subject their execution to some condition precedent other than the mere passage of time—a so-called 'triggering condition.'" *Id.* In this case, the triggering condition was "[o]nce delivery of the parcel has been accepted by a person"—i.e., Ramirez.

In *Grubbs*, the United States Supreme Court held unanimously that anticipatory warrants are constitutional under the Fourth Amendment. *Id.* at 95–97, 126 S. Ct. at 1499–1500. As the Court explained,

> Because the probable-cause requirement looks to whether evidence will be found *when the search is conducted*, all warrants are, in a sense, "anticipatory." In the typical case where the police seek permission to search a house for an item they believe is already located there, the magistrate's determination that there is probable cause for the search amounts to a prediction that the item will still be there when the warrant is executed. . . .
>
> Anticipatory warrants are, therefore, no different in principle from ordinary warrants. They require the magistrate to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed.

*Id.* at 95–96, 126 S. Ct. at 1499–1500.

The Court emphasized there is one wrinkle with anticipatory warrants:

> It should be noted, however, that where the anticipatory warrant places a condition (other than the mere passage of time) upon its execution, the first of these determinations goes not merely to what will probably be found *if* the condition is met. (If that were the extent of the probability

determination, an anticipatory warrant could be issued for every house in the country, authorizing search and seizure *if* contraband should be delivered—though for any single location there is no likelihood that contraband will be delivered.) Rather, the probability determination for a conditioned anticipatory warrant looks also to the likelihood that the condition will occur, and thus that a proper object of seizure will be on the described premises. In other words, for a conditioned anticipatory warrant to comply with the Fourth Amendment's requirement of probable cause, two prerequisites of probability must be satisfied. It must be true not only that *if* the triggering condition occurs "there is a fair probability that contraband or evidence of a crime will be found in a particular place," but also that there is probable cause to believe the triggering condition *will occur*. The supporting affidavit must provide the magistrate with sufficient information to evaluate both aspects of the probable-cause determination.

*Id.* at 96–97, 126 S. Ct. at 1500 (citation omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)). In *Grubbs*, the Court found that both prongs of probable cause were satisfied. *Id.* at 97, 126 S. Ct. at 1500. The occurrence of the triggering condition "would plainly establish probable cause for the search," and "the affidavit established probable cause to believe the triggering condition would be satisfied." *Id.*

Here, too, both elements were met. The affidavit explained that the package containing hidden methamphetamine had been intercepted en route from Mexico to Jessy Robles a/k/a Jesus Ramirez, with the package bearing both Ramirez's address and his phone number. In addition, once the triggering condition—i.e., acceptance of the parcel by a person at this address—took place, there clearly would be probable cause for a search. Thus, there is no dispute that the warrant was a valid federal warrant. In fact, the LaFave treatise observes, "The most typical situation arises when customs agents, upon inspection of international mail coming into the United States, determine that there are drugs concealed in a particular piece of mail"—exactly what occurred

here. 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.7(c), at 497–98 (5th ed. 2012) [hereinafter LaFave]. LaFave adds, "If it is believed desirable that whenever possible the police should obtain advance judicial approval before making a search of private premises, then there is good reason to uphold the anticipatory warrant procedure." *Id.* at 499.

However, we have held that Iowa Code sections 808.3 and 808.4 do not authorize anticipatory warrants in Iowa. *See Gillespie*, 530 N.W.2d at 448–50. In *Gillespie*, a cooperating informant told law enforcement he had purchased cocaine from the defendant. *Id.* at 447. Law enforcement and an assistant county attorney went to a Polk County district judge and obtained an anticipatory warrant to search both the defendant's residence and another location where the cocaine sales to the informant had allegedly occurred. *Id.* According to the warrant, probable cause would be established and the searches could occur once the informant had made a controlled buy from the defendant and returned to the agents either with cocaine or a substance that appeared to be cocaine. *Id.*

We reversed the defendant's conviction. *Id.* at 450. We concluded "our search warrant statutes do not allow [anticipatory] warrants because the statutes do not refer to future events. *Id.* at 448. We quoted the first sentence of Iowa Code section 808.3, emphasizing the second half of the sentence:

> A person may make application for the *issuance* of a search warrant by submitting before a magistrate a written application, supported by the person's oath or affirmation, *which includes facts, information, and circumstances tending to establish sufficient grounds for granting the application, and probable cause for believing that the grounds exist.*

*Id.* (quoting Iowa Code § 808.3 (1991)). We also quoted part of the first sentence of Iowa Code section 808.4, emphasizing the initial words: "*Upon a finding of probable cause for grounds to issue a search warrant,* the magistrate shall issue a warrant . . . ." *Id.* (quoting Iowa Code § 808.4). We then reasoned, "[T]he language 'probable cause for believing that the grounds exist' in section 808.3 suggests that probable cause must exist at the time the warrant is issued and not at some future time." *Id.* Similarly, we found, "The language 'facts, information, and circumstances' for probable cause in section 808.3 also supports our conclusion because the language suggests matters that are in existence." *Id.* In sum, we concluded that "sections 808.3 and 808.4 do not contemplate future acts or events as constituting probable cause." *Id.*[3]

Although the warrant in this case was issued by a federal court at the request of federal authorities, Ramirez warns of a "reverse silver platter" problem. As Ramirez explains, state search-and-seizure protections could be intentionally circumvented by prearranging for a federal search, then using the results of the federal search in state court. We do not question the legitimacy of this concern, but it does not arise in the present case.

---

[3]A handful of other state courts have found a lack of statutory authority in their jurisdictions for anticipatory warrants. *See, e.g.*, *Ex Parte Oswalt*, 686 So. 2d 368, 373–74 (Ala. 1996) (per curiam); *People v. Poirez*, 904 P.2d 880, 883 (Colo. 1995) (en banc); *Kostelec v. State*, 703 A.2d 160, 165 (Md. 1997); *Dodson v. State*, 150 P.3d 1054, 1057–58 (Okla. Crim. App. 2006). We are not aware of any state supreme court declaring such warrants to be per se unconstitutional. *See State v. Moran*, 791 So. 2d 1065, 1068, 1071 (Ala. Crim. App. 2001) (finding an anticipatory warrant valid in Alabama following amendment of the rule at issue in *Oswalt*); *State v. Curtis*, ___ P.3d ___, ___, 2017 WL 2061691, at *9 (Haw. May 15, 2017) (upholding an anticipatory warrant against a challenge under the Hawaii Constitution); *Dodson*, 150 P.3d at 1056 (rejecting a challenge under the Oklahoma Constitution to anticipatory warrants).

The record is devoid of any suggestion that any party was trying to circumvent Iowa search and seizure law. This case began as a federal investigation when CPB officers in Memphis found methamphetamine hidden in an international shipment. It continued as a federal investigation when HSI officers took over the matter in Cedar Rapids and obtained the warrant from a federal magistrate judge. An HSI officer (Mower) then led the joint federal–state team that carried out the controlled delivery and the execution of the search warrant. Although state officials were recruited to work on the matter, an HSI officer made the decision to enter the premises, and HSI officers actually conducted the search itself.

It is true that the case was ultimately turned over for state prosecution. But there is no indication in the record that such a determination had been made before the search warrant was obtained and the search was carried out. Nor does the record suggest there would have been any obstacle to a federal prosecution of Ramirez.[4]

---

[4]In closing argument, Ramirez's trial counsel tried to suggest that the jury could draw an inference from the decision by the federal government to let the State prosecute the case:

> Who did all of the leg work in this case? It was the agents from the Department of Homeland Security. They're the ones that followed up with Fed Ex to determine whether the address on the return address was the actual address or not. It was a real address and not a fake address, as the agent had testified to, that oftentimes most of those packages have a fake address, but this one actually had a real address.
>
> They're the ones that did the search of the apartment. They're the ones that took the photos of the apartment. They're the ones that looked through the trash. They're the ones that followed up with the documents that were found at the scene to determine whether or not those had any additional evidentiary value. Then the question to you would be why then didn't they keep this case? Why did they let it go to the state system?

Noteworthy here is trial counsel's acknowledgment that the search was, in all these respects, a federal search.

In *State v. Davis*, 679 N.W.2d 651 (Iowa 2004), we confronted a related issue. In that case, the defendant who lived on the Missouri side of the Iowa–Missouri border was suspected of committing acts of vandalism in Wayne County on the Iowa side. *Id.* at 654. The Wayne County sheriff met with a Missouri prosecutor who prepared two successive warrant applications. *Id.* at 654–55. The sheriff presented both applications to a Missouri judge who then issued the warrants. *Id.* at 655. Both Missouri and Iowa law enforcement participated in the ensuing searches, which netted evidence of the defendant's involvement in vandalism. *Id.*

Later, the Wayne County District Court granted the defendant's motion to suppress. *Id.* It concluded the results of the searches could not be used in an Iowa case because the searches did not comply with law of the jurisdiction where they were performed. *Id.* In particular, Missouri law did not permit warrant applications to be verified by an out-of-state law enforcement official and, although they could be verified by the local prosecutor, in this instance the prosecutor was not under oath when he signed them. *Id.* The court further reasoned that Iowa does not recognize a good-faith exception to the exclusionary rule for warrants subsequently determined to be defective. *Id.*

On the State's appeal, we reversed. *Id.* at 658–59. We pointed out that while Iowa had rejected the good-faith exception to the exclusionary rule, Missouri had adopted it. *Id.* at 659. Thus, a Missouri court would have allowed the evidence from the two searches to be used if the case had been pending in Missouri. *See id.* We concluded,

> We see no reason to give greater protection to the integrity of the Missouri statutes than the Missouri courts do under similar circumstances. For these reasons, we believe that the good faith exception as recognized by the Missouri courts

applies to the Missouri searches, and the district court should have overruled defendant's motion to suppress.

*Id.*

This case presents a similar conceptual question: Should Iowa invalidate a search that would not have been invalidated under the law of the jurisdiction pursuant to which it was conducted? As in *Davis*, we conclude Iowa should not invalidate the search. In some respects, *Davis* was a harder case. There the Missouri search was unlawful under Missouri law, but we relied on a Missouri good-faith warrant exception even though Iowa refuses to recognize the same exception. Here, by contrast, the search was lawful under federal law. Moreover, in *Davis*, unlike in the present case, the investigation was being led by Iowa law enforcement—yet we held they were not bound by Iowa's exclusionary rule.

Courts in a number of states have concluded that evidence lawfully obtained by federal officials, under a federal investigation meeting federal standards, may be used in a subsequent state prosecution even though state law would not have permitted the same type of search. *See Morales v. State*, 407 So. 2d 321, 329 (Fla. Dist. Ct. App. 1981); *People v. Fidler*, 391 N.E.2d 210, 211 (Ill. App. Ct. 1979); *Basham v. Commonwealth*, 675 S.W.2d 376, 379 (Ky. 1984); *Commonwealth v. Brown*, 925 N.E.2d 845, 849–51 (Mass. 2010); *State v. Mollica*, 554 A.2d 1315, 1327–28 (N.J. 1989); *State v. Toone*, 823 S.W.2d 744, 747 (Texas Ct. App. 1992); *King v. State*, 746 S.W.2d 515, 519 (Tex. Ct. App. 1988); *State v. Coburn*, 683 A.2d 1343, 1347 (Vt. 1996); *State v. Dreibelbis*, 511 A.2d 307, 308 (Vt. 1986); *State v. Bradley*, 719 P.2d 546, 549 (Wash. 1986) (en banc); *State v. Gwinner*, 796 P.2d 728, 731–32 (Wash. Ct. App. 1990); *see also People v. Blair*, 602 P.2d 738, 747–48 (Cal. 1979) (en banc) (finding evidence

admissible that had "been legally seized under federal law and under the law of Pennsylvania, [even though] the seizure would have violated article I, section 13, of the California Constitution if it had occurred in this state").

One frequently cited decision is *Mollica*. *See* 1 LaFave § 1.5(c), at 239 (stating that the approach in *Mollica* "makes good sense"). In *Mollica*, the Federal Bureau of Investigation (FBI) received information that the defendants were operating an illegal bookmaking enterprise in Atlantic City. 554 A.2d at 1318. The FBI then "initiated its own independent investigation" based on this information. *Id.* at 1319. The FBI obtained telephone records from a hotel in Atlantic City, out of which the operation was allegedly run, without a warrant. *Id.* Later, the FBI turned over all information from the investigation, "including [information] reflected in the telephone toll records," to state law enforcement. *Id.* "Based on this evidence, and its own independent confirmation of the fact that [the defendants] were again occupying rooms at [the hotel], the State Police obtained warrants to search these rooms." *Id.* State police discovered evidence of illegal bookmaking as a result of the search and charged the defendants with state-law crimes. *Id.*

The trial court originally ruled that hotel phone records related to an occupant's use of a hotel room "were protected under the State Constitution from unreasonable searches and seizures." *Id.* On appeal, the supreme court agreed, noting that "the seizure of these telephone records is critically vulnerable to a challenge under the State Constitution." *Id.* at 1323. However, that issue was obviated by the court's conclusion on its next issue, "namely, whether state constitutional protections against unreasonable search and

seizure . . . encompass the conduct of federal officers." *Id.* at 1319. The court noted, "Because federal officers necessarily act in the various states, but in the exercise of federal jurisdictional power, pursuant to federal authority and in accordance with federal standards, state courts treat such officers as officers from another jurisdiction." *Id.* at 1327.

Other opinions track the reasoning of *Mollica*. In *Gwinner*, the Washington Court of Appeals concluded that evidence lawfully obtained by federal officials could be admitted in state criminal proceedings "even when evidence obtained in a similar manner by state officers would violate state constitutional strictures." 796 P.2d at 729. In *Gwinner*, state police received information implicating the defendant, which they relayed to a federal task force at an airport. *Id.* The defendant and his truck were seized and cocaine was found in the truck. *Id.*

On appeal, the court observed that "the forfeiture in this case was justified under federal law." *Id.* at 730. The court noted, however, that "we would probably reach a different result" under the Washington Constitution. *Id.* The question, then, became "whether federal officers acting under the belief that they are enforcing 21 U.S.C. § 881 must conform their actions to the requirements of state constitutional law." *Id.* at 731.

In refusing to suppress the evidence, the court noted that the federal officials were not acting under color of state law and were not merely acting on behalf of the state police. *See id.* at 731–32. The court therefore found that suppressing the evidence "would not advance any legitimate state interests in protecting the privacy rights of citizens under" the Washington Constitution, nor would it "deter our state officers from unlawful conduct, since we are not examining the conduct of state officers." *Id.* at 732.

Likewise, in *Fidler*, the Illinois Appellate Court found that evidence lawfully obtained by federal officers was admissible in a state court proceeding although the search would not have been permitted under an Illinois statute. 391 N.E.2d at 211. In *Fidler*, federal employees tapped the phone of an informant and, with the consent of that informant, recorded a phone conversation with the defendant. *Id.* at 210. Based on information from this wiretap, a United States postal inspector then obtained a search warrant from a federal magistrate for the defendant's home. *Id.* at 211. Federal officers searched the house while state law enforcement officials stood outside the residence "[f]or security." *Id.* Thereafter, the federal officers found controlled substances, for which the defendant was prosecuted in state court. *Id.*

On appeal from a denial of the defendant's motion to suppress, the court noted it was "undisputed that the wiretap was lawful under [federal law] . . . and that the procedure employed did not violate the fourth amendment." *Id.* at 210–11. The court also observed it was "clear that the postal authorities did not comply with the requirements" of a similar Illinois statute authorizing wiretapping. *Id.* at 211. The court then reasoned,

> It has been held that a failure by the police and State's attorney to follow the procedures of the [Illinois] statute, taints any evidence obtained [as] a result of the eavesdropping, regardless of whether the procedure employed violated the defendant's fourth amendment rights or not. *People v. Porcelli* (1974), 25 Ill.App.3d 145, 323 N.E.2d 1.
>
> The difference between this case and *Porcelli* is that in this case the eavesdropping was conducted entirely by federal officers who complied with the applicable federal statute, and acted pursuant to an investigation of a violation of federal law.
>
> The purpose of the exclusionary rule is to deter law enforcement officers from violating the constitutional rights

of citizens by removing the incentive for disregarding such rights. The suppression order in this case did not serve this end, however, since the actions of the federal postal authorities, pursuing a wholly federal investigation, were entirely lawful, and the record contains no hint of collusion between federal and state authorities seeking to avoid the limitations of the Illinois Eavesdropping Statute. The only result of the entry of the suppression order in this case is that it prevents highly probative evidence from being available to the finder of fact in a criminal trial. In our view, the order constituted an unwarranted extension of the exclusionary rule and must therefore be reversed.

*Id.* (citation omitted). This reasoning has since been approved by the Illinois Supreme Court. *See People v. Coleman*, 882 N.E.2d 1025, 1032 (Ill. 2008) ("We reaffirm the rule from our appellate court that electronic surveillance evidence gathered pursuant to federal law, but in violation of the eavesdropping statute, is not inadmissible absent evidence of collusion between federal and state agents to avoid the requirements of state law.").

In *King,* a decision that predated *Mollica,* the Texas Court of Appeals rejected the defendant's argument that evidence must be suppressed when Federal Alcohol, Tobacco and Firearms (ATF) agents were issued two successive search warrants for the same property, a practice prohibited by state court rule. *See* 746 S.W.2d at 519. The court explained,

> In this case the federal searches made pursuant to federal warrants were lawful when conducted, and the evidence seized would have been readily admissible in federal courts. This Court concludes that no deterrent effect is gained by excluding from a state court proceeding evidence rightly seized under federal law. Since we hold that the evidence lawfully seized under the second federal warrant was admissible in the state court, we overrule appellant's third point of error.

*Id.* In *Toone,* the Texas Court of Appeals later reasoned that "the application of our state constitution to the officers of another jurisdiction

would disserve the principles of federalism and comity without properly advancing legitimate state interests." 823 S.W.2d at 748. The court therefore held that "evidence lawfully obtained by federal officers acting under a valid federal search warrant is admissible in state criminal proceedings." *Id.*

A recent case on point is *Brown*, 925 N.E.2d at 845. There, the question arose "whether an audio–video tape recording of the defendant's conversation in the home of a cooperating witness was properly admitted in evidence at . . . trial, where it was the product of a Federal investigation in which Massachusetts law enforcement personnel participated." *Id.* at 847. The Massachusetts Constitution prohibits warrantless wiretaps in private homes. *Id.* at 850. The Massachusetts Supreme Judicial Court took note of the trial judge's findings that the United States Drug Enforcement Agency had initiated and led the investigation, assisted by members of local law enforcement. *Id.* The court therefore concluded that suppression of the recording was not warranted. *Id.* It elaborated that

> [o]ne of the purposes justifying [application of the exclusionary rule] is the deterrence of police conduct that unlawfully intrudes on the rights of privacy and security guaranteed our citizens under art. 14, through the preclusion of the fruits of that conduct. Another is the protection of judicial integrity through the dissociation of the courts from unlawful conduct. Where those purposes are not furthered, rigid adherence to a rule of exclusion can only frustrate the public interest in the admission of evidence of criminal activity. In the present case, there is no unlawful conduct to deter. The recordings were made in a federally run investigation in accordance with Federal law, and fell properly within the exemption for the conduct of Federal investigations under State law. To the extent that the conduct of State officials is the object of deterrence, our rulings excluding similar evidence obtained through investigations that are essentially State investigations operating under a Federal moniker are sufficient. Judicial integrity, in turn, is hardly threatened when evidence

> properly obtained under Federal law, in a federally run investigation, is admitted as evidence in State courts. To apply the exclusionary rule in these circumstances as the defendant urges would plainly frustrate the public interest disproportionately to any incremental protection it might afford.

*Id.* at 851 (citations omitted).

We find the reasoning in the foregoing cases persuasive. When a bona fide federal investigation leads to a valid federal search, but the evidence is later turned over to state authorities for a state prosecution, we do not believe deterrence or judicial integrity necessarily require a reexamination of the search under standards that hypothetically would have prevailed if the search had been performed by state authorities.

It is true that a few state jurisdictions have declined to allow evidence seized in a warrantless federal search to be admitted in a state proceeding where the search would have violated *the state constitution.* *See State v. Torres*, 262 P.3d 1006, 1021 (Haw. 2011); *State v. Cardenas-Alvarez*, 25 P.3d 225, 233 (N.M. 2001); *People v. Griminger*, 524 N.E.2d 409, 412 (N.Y. 1988). Yet the present case is different. Although Ramirez raises article I, section 8 of the Iowa Constitution in his briefing, he does not claim that *the search itself* would have violated the Iowa Constitution. Rather, he maintains only that Iowa statutes do not authorize this type of search and, therefore, it would violate the Iowa Constitution *to admit the results of the search in an Iowa court.* We disagree with that broad proposition.

Here a valid search warrant was issued by a federal magistrate judge to federal officers conducting a federal investigation. *Cf. State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013) (noting that warrantless invasion of the home was the "chief evil" that article I, section 8 sought to address). Although state officers were later enlisted to help, this was not

an attempt to bypass the requirements of Iowa law. *Cf. State v. Brown*, 890 N.W.2d 315, 327 (Iowa 2017) (holding that warrantless searches performed by an off-duty police officer were motivated by a "legitimate" private interest, were therefore not covered by article I, section 8, and could be used in a state-court prosecution). While Iowa law would not have authorized the type of warrant issued, no argument is raised that the search—if statutorily authorized—would have violated the Iowa Constitution. *Cf. State v. Cline*, 617 N.W.2d 277, 293 (Iowa 2000) (declining to adopt a good-faith exception to the exclusionary rule for unconstitutional searches because "[t]o do so would elevate the goals of law enforcement above our citizens' constitutional rights"), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001).

Under this combination of circumstances, we cannot say that the admission of the results of the May 16, 2015 search either rewarded unlawful police conduct or undermined the integrity of our courts. Rather, it accorded a proper recognition to the bona fide actions of the federal government pursuant to that government's lawful authority, including the official acts of a federal magistrate judge.

## IV. Conclusion.

For the foregoing reasons, we affirm Ramirez's conviction and sentence.

**AFFIRMED.**

Cady, C.J., and Waterman and Zager, JJ., join this opinion. Wiggins, J., files a dissenting opinion in which Hecht and Appel, JJ., join.

#15–1807, *State v. Ramirez*

**WIGGINS, Justice (dissenting).**

I respectfully dissent. The court should have suppressed the evidence obtained in Iowa for use in an Iowa court.

The majority bases its opinion on cases that subscribe to the reverse silver-platter doctrine. The majority finds these cases persuasive. However, in finding these cases persuasive, the majority fails to examine the underpinnings of the silver-platter doctrine as originally established and abandoned by the federal courts. The majority also fails to reconcile its position with the reasons why we apply the exclusionary rule in Iowa. In Iowa, we should not decide an issue by color matching the facts from other jurisdictions. Rather, we should look behind the facts of those cases and determine if the reasoning of those cases comport with our Iowa precedent.

I start my analysis by examining the silver-platter doctrine and federal jurisprudence. The silver-platter doctrine describes the situation in which federal courts admit evidence in federal court seized as a result of an unreasonable search and seizure by state officers. *Elkins v. United States*, 364 U.S. 206, 208, 80 S. Ct. 1437, 1439 (1960). In the past, federal courts accepted the doctrine and admitted the evidence in federal court. *See Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346 (1914). In *Elkins*, the United States Supreme Court rejected the silver-platter doctrine. *Elkins*, 364 U.S. at 208, 80 S. Ct. at 1439.

In rejecting the silver-platter doctrine, the Court sought to preserve the judicial integrity of the federal court system. *Id.* at 222, 80 S. Ct. at 1447. As the Court noted,

> There it was held that "a conviction resting on evidence
> secured through such a flagrant disregard of the procedure
> which Congress has commanded cannot be allowed to stand

> without making the courts themselves accomplices in willful disobedience of law." Even less should the federal courts be accomplices in the willful disobedience of a Constitution they are sworn to uphold.

*Id.* at 223, 80 S. Ct. at 1447 (quoting *McNabb v. United States*, 318 U.S. 332, 345, 63 S. Ct. 608, 615 (1943)). As I explain in this dissent, Iowa precedent supports the same proposition—Iowa courts should not be accomplices in violations of state law.

The reverse silver-platter doctrine refers to a situation in which state courts admit evidence obtained by federal officers in a manner that does not violate federal law, but violates state law or the state constitution. At least three other states have refused to adopt the reverse silver-platter doctrine. *State v. Torres*, 262 P.3d 1006, 1020 (Haw. 2011); *State v. Cardenas-Alvarez*, 25 P.3d 225, 233 (N.M. 2001); *People v. Griminger*, 524 N.E.2d 409, 412 (N.Y. 1988). New York and New Mexico courts rely on the principle espoused in *Elkins* to reject the reverse silver-platter doctrine. Citing *Elkins*, the Court of Appeals of New York stated, "Since defendant has been tried for crimes defined by the State's Penal Law, we can discern no reason why he should not also be afforded the benefit of our State's search and seizure protections." *Griminger*, 524 N.E.2d at 412. The New Mexico Supreme Court stated its rationale as follows: "Although we do not claim the authority to constrain the activities of federal agents, we do possess the authority—and indeed the duty—to insulate our courts from evidence seized in contravention of our state's constitution." *Cardenas-Alvarez*, 25 P.3d at 233.

If I were to color match the facts, I might make the statement that I find the New York and New Mexico courts more persuasive. However, that is not what courts do. Our obligation is to look behind the facts and determine if the reasoning of the cases from other jurisdictions is

consistent with Iowa precedent. The fact that other state court cases adopt a position is not determinative of Iowa law. *State v. Halstead*, 791 N.W.2d 805, 811 (Iowa 2010). When deciding Iowa law questions, we determine the persuasiveness of other authorities by the quality of the analysis. *Id.* I believe the exclusionary rule analysis done by the Hawaii Supreme Court is most persuasive and the one we should follow in this case.

In Hawaii, before rejecting the reverse silver-platter doctrine, the supreme court applied an exclusionary rule analysis. *Torres*, 262 P.3d at 1013. The use of the exclusionary rule analysis began trending in courts by 1988. Tom Quigley, *Do Silver Platters Have a Place in State-Federal Relations? Using Illegally Obtained Evidence in Criminal Prosecutions*, 20 Ariz. St. L.J. 285, 322 (1988). The exclusionary rule analysis requires "the court first identif[y] the principles to be served by the exclusionary rule, and then evaluate[] how the principles would be served by exclusion." *Torres*, 262 P.3d at 1013–14 (quoting *State v. Bridges*, 925 P.2d 357, 365 (Haw. 1996), *overruled by Torres*, 262 P.3d at 1021).[5]

In Iowa, we have identified three principles the exclusionary rule serves. First, it preserves the integrity of the judicial process. *State v. Prior*, 617 N.W.2d 260, 268 (Iowa 2000). Next, it protects the privacy of individuals by providing redress for the invasion of an individual's privacy interest. *State v. Cline*, 617 N.W.2d 277, 289 (Iowa 2000),

---

[5]The Hawaii Supreme Court recently decided anticipatory search warrants are allowed under Hawaii law. *See State v. Curtis*, ___ P.3d ___, ___, 2017 WL 2061691, at *9 (Haw. May 15, 2017). However, this decision by the Hawaii Supreme Court does not change the fact that the Iowa legislature does not allow anticipatory search warrants under Iowa law, nor does *Curtis* undermine the exclusionary rule analysis in *State v. Torres*. *Id.* at *12 ("This holding is consistent with the purposes underlying Hawaii's exclusionary rule: judicial integrity, protection of individual privacy, and deterrence of illegal police misconduct.").

*abrogated in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). Third, the rule serves to deter police misconduct. *Id.*

The judicial integrity purpose of the exclusionary rule is based on the proposition that "[b]y admitting evidence obtained illegally, courts would in essence condone the illegality by stating it does not matter how the evidence was secured." *Id.* The majority concludes the judicial integrity purpose only applies to evidence obtained in violation of the Iowa Constitution and not evidence obtained in violation of Iowa statutes. This is a misreading of Iowa law.

In Iowa, we protect the integrity of the judicial system by enforcing our search and seizure statutes. *See State v. Beckett*, 532 N.W.2d 751, 755 (Iowa 1995). In *Beckett*, a magistrate failed to make a finding required under Iowa Code section 808.3 as to the informant's credibility before issuing a search warrant. *Id.* at 751. The district court refused to suppress the evidence obtained by that search warrant by applying the good-faith exception doctrine established in *United States v. Leon*, 468 U.S. 897, 905, 104 S. Ct. 3405, 3411 (1984). *Id.* On appeal, we reversed the district court and suppressed the evidence to protect the integrity of the judicial system and our search and seizure statutes. *Beckett*, 532 N.W.2d at 755. In doing so, we stated,

> The statutory requirement is the legislature's unambiguous expression of its desire that a magistrate issuing a search warrant shall make a determination that the informant is credible and state the reason or reasons for that finding. Adopting a good faith exception to the statutory requirement would effectively defeat the purpose of the statute because failure to comply with the statute would be of no consequence. In light of the clear purpose of section 808.3, permitting a good faith exception to failure to comply with the statute would be tantamount to judicial repeal of the statute.

*Id.*

The Iowa legislature has not authorized anticipatory search warrants under Iowa Code sections 808.3 and 808.4. *State v. Gillespie*, 530 N.W.2d 446, 448–50 (Iowa 1995). Sections 808.3 and 808.4 are the very same sections involved in *Beckett*. If we allow the State to admit the evidence obtained by the anticipatory search warrant in our state court, it would violate the same search and seizure statues we were unwilling to weaken in *Beckett*. I find that by allowing the State to admit the evidence in our state courts, we implicate the integrity of our judicial system. Thus, the exclusion of the evidence in this case serves the judicial integrity purpose of the exclusionary rule.

The privacy purpose of the exclusionary rule is rooted in the expectations a person has in the laws of the state of Iowa to protect a person's privacy. Article I, section 8 of the Iowa Constitution contains the expectations of a person's constitutionally protected privacy rights in the context of a search and seizure. Iowa Code chapters 808, 808A, and 808B contain the expectations of a person's statutorily protected privacy rights in the context of a search and seizure. A person living in Iowa expects that the State cannot use evidence obtained in violation of Iowa law in a criminal prosecution in our Iowa courts. Thus, the exclusion of the evidence in this case also serves the privacy purpose of the exclusionary rule.

The deterrence purpose of the exclusionary rule is to deter police officials from violating our constitution or state laws when it comes to search and seizures. We apply the exclusionary rule to statutory violations. *Gillespie*, 530 N.W.2d at 450. Here, Iowa law enforcement was involved in the search. The application of our exclusionary rule serves the purpose in this case and future cases to deter any federal and

state cooperation to evade our state laws. *See Torres*, 262 P.3d at 1020 (holding the exclusion of the evidence obtained by the federal authorities would deter future violations of state law even though no state actors were involved in the present search).

Finally, I contend the majority's reliance on *State v. Davis*, 679 N.W.2d 651 (Iowa 2004), is also misplaced. In *Davis*, a Missouri judicial officer issued a search warrant to search property located in Missouri and owned by a Missouri resident. *Id.* at 654. The issuance of the search warrant violated a Missouri statute because an Iowa peace officer verified the application. *Id.* at 657–58. Even with this violation of the Missouri statute, the state of Missouri would not suppress the evidence discovered in the search because the Missouri courts recognize an exception to the exclusionary rule when an officer executing a search warrant relies on the warrant in good faith. *Id.* at 658. In allowing the state to admit the evidence seized in Missouri from a Missouri resident on Missouri property in our court, we gave two reasons as to why the evidence was admissible. First, we noted,

> The search warrants met all the requirements of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution because they were issued on probable cause, supported by the oath of Sheriff Davis, and particularly described the place to be searched and the things to be seized. We do not have any concerns regarding the trustworthiness of the evidence seized.

*Id.* at 659. Second, we decided we should not "give greater protection to the integrity of the Missouri statutes than the Missouri courts do," because Missouri had adopted the good-faith exception. *Id.*

The case before the court today is factually and legally distinguishable from *Davis*. A pertinent factual difference is that Ramirez is an Iowa resident whereas Davis was a Missouri resident.

Additionally, the court in this case issued the search warrant to search property located in Iowa. In *Davis*, the property was located in Missouri. These are important differences when attempting to draw a comparison between the analysis in *Davis* and this case.

In *Davis*, we said that by the Missouri courts adopting the good-faith exception to the exclusionary rule, it had no interest in protecting the integrity of its search and seizure statutes. *Id.* On the other hand, "[i]n Iowa we refuse to apply the good faith exception to the exclusionary rule when a defect exists in the application for a warrant to protect the integrity of the statutes passed by our legislature." *Id.*; *see also Beckett*, 532 N.W.2d at 755. These important differences affect the legal analyses of the two cases. Thus, I would conclude, *Davis* does not support the majority's opinion.

Accordingly, I would hold evidence obtained by a search warrant issued by the federal court to search property located in Iowa and owned by an Iowa resident would be subject to the exclusionary rule in an Iowa prosecution. This does not mean the federal government cannot prosecute Ramirez for his alleged criminal conduct in federal court. I recognize the supremacy of the federal government. I also encourage federal authorities to continue to enforce and prosecute the law in a manner as the Federal Constitution permits. However, we should not abandon our constitutional and statutory protections afforded to persons in Iowa to affirm a conviction that should have taken place in federal court.

Hecht and Appel, JJ., join this dissent.