**IN THE COURT OF APPEALS OF IOWA**

No. 23-1785
Filed October 30, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**EVAN BLAKE WOOTEN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Tamra Roberts, Judge.

A defendant appeals his conviction for domestic abuse assault, claiming insufficient evidence supports his conviction. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

Evan Wooten was seen throwing "[c]losed fist, haymakers" at his girlfriend's head during a violent altercation in an apartment complex parking lot. Many of those haymakers landed, and his girlfriend was transported via ambulance to a local hospital to treat her injuries. Wooten was charged with and convicted of domestic abuse assault causing bodily injury in violation of Iowa Code section 708.2A(2)(b) (2023). Wooten admitted two prior domestic abuse convictions and two prior felony convictions, leading the district court to sentence him as a third-time domestic abuser and habitual offender pursuant to Iowa Code sections 708.2A(4) and 902.9. Wooten was given an indeterminate fifteen-year prison sentence, with a mandatory three-year minimum.

On appeal, he contends the evidence was insufficient to establish he and the victim were "family or household members," which was defined for the jury as "persons cohabiting with each other." Therefore, he argues the evidence was insufficient to convict him of domestic abuse assault causing bodily injury. After our review of the record, we affirm Wooten's conviction.

## I. Background Facts and Proceedings

Wooten and E.M.[1] began a relationship with each other in December 2022. At the time, both lived in Milan, Illinois. Wooten lived at a residence with Taylor Camp—the mother of his children. E.M. lived with her mother. According to E.M., her relationship with Wooten quickly blossomed, and the two began "seeing each other almost every weekend." By January 2023, E.M. and Wooten were spending

---

[1] Out of respect for the victim's privacy, we refer to her throughout this opinion by her initials.

nights together at an apartment in Davenport rented by Wooten's cousin.  E.M. estimated she and Wooten spent two nights a week together at his cousin's apartment.  In February, Wooten and E.M. took a three-day vacation together in Florida.

Sometime around March E.M. and Wooten moved into an apartment together in Davenport.   When the couple moved in, they had very little furniture.  As E.M. explained, "[w]e were both sleeping on blankets and pillows on the floor, plus working together, and it felt like something we both wanted."  When he moved in, Wooten brought a few bags, clothes, and shoes.  While they were living together in the apartment, E.M. described her relationship with Wooten as a "sexual relationship."

But friction in the couple's relationship developed shortly after they moved in together.  E.M., after going through Wooten's phone, discovered he was being unfaithful.  This led to increasing tension between the two.  Adding to that tension was the fact Wooten was expecting a child with Camp.  In early April, Wooten spent two nights with Camp in Illinois.  Wooten told E.M. "he had to go take care of the mother of his children because she was pregnant."  Although E.M. was aware Wooten was living with Camp when she began seeing him, she testified Wooten told her he was not in a relationship with Camp.  She was under the impression Wooten only lived with Camp to be with his kids.

On April 7, the friction in Wooten and E.M.'s relationship reached a boiling point.   That night at their apartment, E.M. searched Wooten's phone and discovered he was cheating on her with another woman.  In fact, text messages on Wooten's phone revealed he had been with another woman that same day.

This upset E.M., and she attempted to leave the apartment. However, Wooten talked her out of it. The next morning, Wooten realized E.M. had searched his phone. In retaliation, Wooten locked E.M. out of her phone. According to E.M., Wooten "proceeded to lock me out of my phone to where I couldn't even get into it. I couldn't call anybody. I couldn't even get past the passcode." After Wooten locked E.M.'s phone, he left the apartment to attend a baby shower for Camp. E.M. was left alone at the apartment with no phone or means of transportation.

That afternoon E.M. walked several miles to get her phone fixed at a T-Mobile store in Davenport. As she was getting her phone fixed, she used one of the store's phones to call Wooten to pick her up. But Wooten told her "[he] couldn't talk to her right now because [he] was at my baby shower." Wooten eventually left the baby shower to pick up E.M. When Wooten first arrived at the T-Mobile store, he grew impatient while waiting for E.M. He drove off from the store once but came back when E.M. called him again. Wooten and E.M. then drove back to their apartment.

When they arrived at their apartment, E.M. testified that:

We get home; I park the car. And it was just frustrating. I was annoyed, irritated. He was irritated, so. And then we both go to the apartment. He goes to the bathroom. I'd gone to the bedroom to change my clothes because I wanted to change my clothes. He comes out of the bathroom, goes to the kitchen, grabs a frozen pizza from the refrigerator, comes into the bedroom, and throws it at me. And then stumbles out of the hallway and tries to leave.

But as Wooten headed for the door, E.M. sprinted in front of him to prevent him from leaving. A struggle ensued in the doorway, in which Wooten tried to remove E.M. by repeatedly "pushing and pulling" her. In E.M.'s words, "[w]hen that didn't work, he picked me up and dropped me face-first in our living room." After he

dropped E.M. on the floor, Wooten walked down the stairs leading from the couple's second-story apartment and headed for his car. E.M., in tears at this point, chased after Wooten and followed him to the parking lot. As she was chasing him, E.M. was "begging" Wooten not to leave her.

When E.M. caught up with Wooten in the parking lot, Wooten was sitting in the driver's seat in his car with the door open. E.M. placed herself between the car and the open driver's side door to prevent Wooten from leaving. E.M. begged and pleaded for Wooten to stay. "But he didn't want to do that. He told me to get away from his car and kept saying that he hated me." With the driver's side door open and E.M. in its way, Wooten attempted to drive off. As Wooten tried to drive off, the driver's side door "made a breaking noise." Wooten then stopped the car, and E.M. opened the passenger side door and hopped into the front seat.

As E.M. was sitting in the front seat with Wooten, she testified "he kept telling me to get out of the car, that he hated me, and I was every name in the book to him." When E.M. refused to get out of the car, Wooten slapped her several times. He then punched her several times in the left side of her face. At this point, E.M. testified:

> I still wasn't out of the car like he wanted. He wanted to leave. So he got out of the driver's seat, walked over to the passenger [side], opened the passenger seat door, and started to punch me on my upper chest, my ribs, and my thigh, and then tried to pull me out of the car.

As the assault was taking place in Wooten's car, Cheyenne Morgan was in his first-floor apartment playing video games. His living room window was open, and he could hear "screaming and stuff." Morgan looked outside his window and saw Wooten assaulting E.M. As Morgan testified, "I just heard phrases of 'I love you,'

and I heard crying. And then I heard, like, muffled sounds. So I just looked through the blinds, and the defendant was hitting a woman—the woman." Morgan added that Wooten's punches were thrown with force, "[l]ike you're trying to knock somebody out." Morgan called 9-1-1 after witnessing the assault.

Several Davenport police officers quickly arrived at the apartment complex after Morgan's call. They found E.M. sobbing and hyperventilating on the curb of the main entrance leading into the complex. She was subsequently placed in an ambulance and transported to a local hospital. Wooten was found standing outside of his car with music blaring. After the police interviewed Wooten, he was arrested.

Based on these facts, a jury convicted Wooten of domestic abuse assault causing bodily injury. He appeals.

## II.     Standard of Review

"We review a challenge to the sufficiency of the evidence for errors at law, giving deference to the verdict, which binds us if it is supported by substantial evidence." *State v. LuCore*, 989 N.W.2d 209, 215 (Iowa Ct. App. 2023). In conducting this review, we view the evidence in the light most favorable to the State, "including all reasonable inferences that may be fairly drawn from the evidence." *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (citation omitted). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017) (citation omitted).

## III.    Analysis

The jury was instructed that to find Wooten guilty of domestic abuse assault, the State was required to establish the assault on April 8 "occurred between family or household members who resided together at the time of the incident or within the past year."  *See* Iowa Code § 236.2(a), (d); *see also id.* § 708.2A(1).  The jury instructions further defined "family or household members" as "persons cohabiting with each other."  *See* Iowa Code § 236.2(4)(a).  Cohabitation was explained to the jury in the following way:

> "Cohabiting" does not require a sexual relationship but does require more than dwelling or living together in the same place.  To determine if the defendant and [the victim] were cohabiting at the time of the alleged offense, you may consider whether they had sexual relations while sharing the same living quarters; they shared income or expenses; they jointly used or owned property together; they held themselves out as husband and wife; the continuity and length of their relationship; and any other facts shown by the evidence bearing on their relationship with each other.

*See State v. Kellogg*, 542 N.W.2d 514, 518 (Iowa 1996) (setting forth six nonexclusive factors for courts to consider in determining whether persons are cohabiting for purposes of chapter 236).

In arguing that the State produced insufficient evidence, Wooten asserts that none of the six *Kellogg* factors were supported by substantial evidence.  We disagree.  Several of the *Kellogg* factors were established by substantial evidence.  Thus, substantial evidence was presented which would permit a reasonable jury to determine that Wooten cohabited with E.M.  *See State v. Virgil*, 895 N.W.2d 873, 881 ("[W]hether two people were cohabiting is a question of fact for the jury.").

First, we note substantial evidence established that Wooten and E.M. were in a continuous relationship that began as early as December 2022.  *See Kellogg*,

542 N.W.2d at 518 (noting the continuity and length of the relationship are a factor to consider in assessing whether cohabitation existed). E.M. testified that she and Wooten became better acquainted in December 2022 and quickly started to see each other nearly every weekend. They spent nights together as early as January 2023 at an apartment in Davenport and took a vacation together in Florida one month later. A police body camera video, which was admitted into evidence, showed Wooten refer to E.M. as his "girlfriend" as he was being interviewed by police officers. Wooten seems to contend he could not have been in a continuous relationship with E.M. because he was simultaneously in a relationship with Camp. But the fact that he was a serial cheater does not mean he was not in a continuous relationship with E.M.

Second, substantial evidence was also produced to establish E.M. and Wooten shared living quarters while engaging in a sexual relationship. E.M. testified she and Wooten moved into the apartment together on or about March 21, 2023. She also testified that—other than two nights in early April—she and Wooten continuously lived together at the apartment. Additionally, E.M. testified she and Wooten were in an active sexual relationship while living together at the apartment. We also note text messages between Wooten and E.M. admitted into evidence show Wooten referring to the apartment as "my crib" and "our apartment." He also referenced *his* key to the apartment. From this evidence, a jury could rationally infer Wooten and E.M. were cohabiting. *See State v. Lee*, No. 17-0413, 2018 WL 1099273, at *2 (Iowa Ct. App. Feb. 21, 2018) (finding cohabitation was established by substantial evidence where evidence showed defendant and his victim dated for a few months and quickly moved in together); *see also State v.*

*Jackson*, No. 99-1924, 2001 WL 23152, at *2 (Iowa Ct. App. Jan. 10, 2001) (noting finding of cohabitation was supported by substantial evidence based off a "boyfriend/girlfriend" and sharing of the same residence).

Third, several other factors bolster our conclusion. We note the record establishes Wooten kept personal belongings at the apartment he shared with E.M. Wooten testified at trial that he asked his uncle to retrieve clothes and shoes from the apartment after he was arrested. E.M. testified that Wooten brought multiple bags with him when he moved into the apartment. *Cf. Virgil*, 895 N.W.2d at 883 (finding the fact that the defendant kept one garbage bag of things at the victim's residence did not support an inference of cohabitation). Additionally, in a text message sent by Wooten to E.M. admitted into evidence, he wrote "I got mail coming there." This supports an inference of cohabitation. *See State v. Smith*, No. 22-1848, 2023 WL 8069248, at *3 (Iowa Ct. App. Nov. 21, 2023) (noting finding of cohabitation was supported by the fact the defendant had his mail sent to the residence he shared with the victim).

Accordingly, we find substantial evidence supports the jury's finding of cohabitation.

## IV.  Conclusion

Because we find substantial evidence supports the jury's determination of cohabitation, we affirm Wooten's conviction for domestic abuse assault causing bodily injury.

**AFFIRMED.**