# IN THE COURT OF APPEALS OF IOWA

No. 17-0208
Filed November 8, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MICHAEL E. PIEPER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Lee County (North), Mark E. Kruse,

District Associate Judge.

Michael Pieper appeals his conviction of felonious misconduct in office

following a jury trial, challenging the sufficiency of the evidence. **REVERSED**

**AND REMANDED.**

Matthew G. Whitaker and Kendra L. Mills Arnold of Whitaker Hagenow &

Gustoff LLP, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant

Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

Michael Pieper appeals his conviction of felonious misconduct in office following a jury trial. He argues there was insufficient evidence to support his conviction, among other things. Because we agree, we remand the case to the district court to vacate his conviction and dismiss the case.

### I. Background Facts and Proceedings.

The history of the Green Bay Levee and Drainage District No. 2 (District) was detailed in a prior opinion by a panel of this court and is therefore not repeated here. *See Pieper, Inc. v. Green Bay Levee & Drainage Dist. No. 2*, No. 15-2032, 2016 WL 7395742, at *1-4 (Iowa Ct. App. Dec. 21, 2016). Relevant to the issues in this case, Michael Pieper was elected to serve as one of the three trustees on the District's Board of Trustees (Board). The other two members serving during the relevant time frame were Michael Walker and Pieper's first cousin Craig Pieper. Both Michael Pieper (Pieper) and Walker owned their own businesses while serving as Board trustees.

In or about 2011, the District learned it would receive FEMA funding to restore and reshape its levees that sustained flood damage in 2008. To that end, a civil engineer and his firm were hired by the Board to draw up plans for the project. In very general terms, this required the engineer to determine how to rebuild the levees to make them as impervious to flood waters as possible. Many factors are involved in making this determination; dirt is not simply trucked in and dumped along the river's edge. Rather, the existing soil of a levee had to be analyzed to determine the soil's seepage and permeability, and with that information, the engineer determined what material and soil composition to use

and where to use it to reconstruct the levee. Much like an architect, the engineer's work resulted in a design plan that contractors would follow to complete the project. However, the engineer also served as an on-site inspector, periodically inspecting the contractor's work.

As part of the engineer's plans, certain areas located within the District's right-of-way were designated "borrow areas." The contractor was to take soil located in the designated "borrow area" and relocate it for use in the levee. Selecting the borrow areas required a delicate balance; taking soil from an area too close to the levee could weaken and ultimately damage the levee. Taking soil beyond a certain depth could change the soil's saturation and add costs. Taking soil from an area too far away unnecessarily increased costs, as did taking soil from land not in the District's right-of-way.

Before contractors submitted bids to work on the project, the engineer provided project information to potential bidders, setting forth the project's requirements and instructions. Bids were thereafter accepted from contractors. The lowest bid submitted was from Pieper's business, MEPCO, and MEPCO was awarded the contract. At this time, Pieper was serving as the Board's chairman. Pieper agreed that he would abstain from the issues related to the contract before the Board.

By April 2012, there were disputes between the engineer, Walker—in his capacity as a Board trustee, and Pieper—as both the chairman of the Board and as the owner of MEPCO. Walker believed the engineer was improperly following Pieper's instructions, i.e. that the engineer was taking the position of the contractor, MEPCO, over the interest of the District. The engineer believed

Pieper's instructions were given on behalf of the Board, not MEPCO.

In or about June 2012, the engineer learned from his site-inspector that an area had been excavated by MEPCO without authorization—i.e., soil had been removed from an area that was not designated a "borrow area." The engineer's analysis of that area, based upon topographical scans, found that "approximately 32,060 cubic yards of material had been removed out of that area." Upon further inspection, it was determined that the removal of this soil weakened that part of the levee, and the Army Corps of Engineers directed that the levee had to be restored back to its original design condition or the District risked "being thrown out of the federal program" and losing federal assistance for repair of the levee in the event of a catastrophe or loss. The engineer confronted Pieper about the issue. Pieper asserted only 2500 cubic yards had been removed.

The matter came before the Board at its June 28, 2012 meeting. All three trustees were present, as well as the Board's clerk, Vic Pierrot. Pierrot had served as the Board's clerk since 2005 and performed the duties normally associated with secretary and treasurer roles. Pierrot had decided to retire after sustaining a head injury, and the June meeting was to be Pierrot's last meeting. During Pierrot's tenure, if he was unable to attend a Board meeting, his daughter would fill-in for him. She was present at the meeting and took some notes. Also present at the meeting was the new clerk, Kim Ransdell, who had agreed to fill-in as the clerk after Pierrot retired. Ransdell was a paralegal who had worked with Pieper in the past, and Pierrot recommended her for the position at the meeting. Pierrot agreed to assist her in the transition and to provide her with a "flash drive containing all the work done since taking the job."

The June meeting was contentious and lasted four hours, ending around eleven p.m. A member of the public, who, at the time of trial was serving as a trustee, began video-recording the meetings in May 2012. He recorded the June, July, and August 2012 meetings.

Following the June meeting, Pierrot drafted "Unapproved Minutes" from the meeting to be approved at the next meeting of the Board. Those unapproved minutes stated that at the June 28, 2012 meeting, the minutes from the May meeting were read, amended, and then approved unanimously by the Board. Among other things discussed at the meeting, Pierrot's draft indicated the Board talked about conflicts of interest. The draft also stated, in relevant part:

> Lodwick [right-of-way (ROW)]- The culvert must be removed before the next meeting.
>
> Mississippi levee disturbances- Several areas where haul-through accesses were notched into the levee must be repaired per Corps specifications.
>
> The main levee is 67% complete.
>
> *Lost Creek project*- Restoration of ROW along Lost Creek levee is nearly complete.
> Mike W moved, Craig seconded:
> Seeding must be complete by July 15. Mepco must provide indemnification to address any soil erosion or seeding damage that occurs before July 2017.
> Discussion: None
> Results: Unanimous in favor with Mike P abstaining.

The draft closed that it was submitted by Pierrot and had three blank lines for each trustee's signature.

On July 24, 2012, Ransdell sent Pieper an email with the subject line

"Revised minutes of the meeting."[1]  The revised draft sent to Pieper contained

several changes and additions, those relevant underlined below:

> Lodwick ROW- The District <u>asked</u> the contractor <u>if the culvert could be</u> moved by next meeting.
>
> The main levee is 67% complete.
>
> <u>Craig Pieper motioned to accept borrow area from Station 840 to Station 880.</u>
> <u>Mike Walker seconded the motion</u>
> It was recommended that it be seeded by July 15.  <u>Mepco must repair</u> any soil erosion from water flowing from this area until July 2017.  Discussion: None Results: Vote to approve was unanimous in favor with Mike P abstaining.

Like the prior draft, the revised draft stated it was submitted by Pierrot and had

three blank lines for the trustees' signatures.

At the July 2012 hearing, the June 2012 minutes were read for approval.

The July 2012 minutes stated:

> Minutes of the June 28, 2012 regular meeting were read.
> Craig moved to accept minutes as amended.
> [Pieper] seconded.
> Discussion: None.
> Results: Unanimous in favor
> [Walker] presented his own version of the borrow area minutes.  [Walker] asked to make corrections to the minutes and additions to correct the borrow area during the minutes that were read.  [Pieper], Chairman stated that the corrections to the minutes by [Walker] were never discussed at the meeting and they may have been discussed prior to the meeting and no changes were made and minutes are stood as read.

At the August 2012 meeting, the July 2012 minutes were read for

approval.  The minutes from the August 2012 meeting stated:

> [Walker] moved to correct June 28th and July 26th 2012 minutes.
> [Walker] again presented his own version of the borrow area

---

[1] On cross-examination, Ransdell testified she sent the email to all three Board members.

> minutes. [Walker] asked to make corrections to the minutes and additions to correct the borrow area the minutes were read. [Pieper], Chairman stated that the corrections to the minutes by [Walker] were never discussed at the meeting and they may have been discussed prior to the meeting.
> Amendments and Corrections will be the following to read as:
> [Walker] moved to accept minutes as amended by removing the word after to during. Changes to paragraph regarding Sara Jones will be changed from Walsh to the Corps.
> [Craig] seconded the amendments and corrections.
> Discussion: None.
> Results: Unanimous in favor with [Walker] opposing.

Walker refused to sign the July 2012 minutes at the August 2012 meeting because he did not believe the July 2012 minutes reflected what was discussed and approved at the June 2012 meeting.

In April 2015, Pieper was interviewed by Lee County Deputy Sheriff Stacy Weber as part of the deputy's investigation. Pieper never made any admissions that he changed the June 2012 minutes. Ultimately, Pieper was charged with felonious misconduct in office for falsifying the minutes to add in language that was favorable to his own company MEPCO but adverse to the District.

The matter proceeded to trial in October 2016. The video-recordings from the June, July, and August 2012 meetings were played for the jury. Additionally, testimony was received from Pierrot, Ransdell, Walker, and others concerning the June 2012 meeting and the minutes that followed. Craig Pieper testified, but he had no real recollection of the June 2012 meeting, only that MEPCO would be responsible for reseeding the area where soil had been taken improperly.

Pierrot testified he learned changes had been made to his draft of the June 2012 meeting minutes after the fact; Pieper did not ask him to make any changes to the minutes. Pierrot agreed the general procedure concerning the

minutes was that the Board's meeting minutes were considered a draft and could be revised until approved at the following meeting. He also testified he passed everything he had on to Ransdell after his participation in the June 2012 meeting.

Ransdell testified she received from Pierrot a flash drive with the minutes on it. She understood she was to email the draft to all three members before the upcoming meeting, and she thought that she did. She admitted she emailed Pieper the "revised minutes," but she was unsure who made the changes to the revised draft she sent to Pieper. She said, "I have no idea. There's a possibility that [Pierrot] and I worked on them together. I don't know." Ransdell testified she didn't know if she made revisions to the minutes before sending them out. She testified Pieper never asked her to change the minutes or make any insertion into the minutes. She did testify she told the Board members that it would be illegal or unethical for her to change Pierrot's minutes, "especially when [she] was new and [she] didn't know what [she] was doing." Ransdell was asked again if she changed the minutes and she responded, "Not that I know of. I don't know."

Walker testified he first saw the draft of the June 2012 meeting minutes about an hour before the July 26, 2012 meeting.[2] He testified that, contrary to the revised draft of the June 2012 meeting minutes, Craig Pieper never motioned to accept borrow area from Station 840 to Station 880, and he therefore did not second the motion. Walker testified this should not happen because he believed it shifted liability from MEPCO to the District. He testified that after he received the draft, he immediately typed corrections and additions, which he submitted at

---

[2] Ransdell's email indicates it was sent on July 24, 2012 at 12:50 p.m.

the July meeting. Walker recalled that the amendment had been accepted into the minutes, and he testified he signed the last page of the revised June meeting minutes because he believed his amendment was incorporated therein. Beyond asking to have his amendment accepted, it is not totally clear if a formal motion was made by Walker. It appeared Craig Pieper had seconded a motion to accept the amended minutes, but it is unclear what was being amended. There does not appear to have been an official vote on the matter.[3] Walker testified he refused to sign the July 2012 meeting minutes at the August 2012 meeting because it misstated what had been decided at the June 2012 meeting. The recording of the June 2012 meeting shows that the indemnification issue was discussed, and Walker testified he recalled "everybody agreeing that MEPCO would handle the reseeding and repairs through July of 2017." Walker signed the June meeting minutes because he thought his amendment had been accepted.[4]

The jury found Pieper guilty as charged. Pieper now appeals the verdict, challenging the sufficiency of the evidence to support his conviction. "Sufficiency of evidence claims are reviewed for correction of errors at law, and we will uphold a verdict if substantial evidence supports it." *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). "We consider the evidence in the record 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence,'" but we also consider evidence that does not support the verdict. *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017) (citation omitted).

---

[3] The Board's meetings appear to have been conducted in a loosey-goosey fashion with little regard to *Robert's Rules of Order*.

[4] All three Trustees signed the June meeting minutes.

Substantial evidence must do more than raise suspicion, speculation, or conjecture, "it must convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt." *Id.*; *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). If we find the evidence was insufficient to sustain the conviction, double-jeopardy principles prohibit a retrial and require remanding for dismissal of the charge. *See State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2013); *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003); *see also State v. Rooney*, 862 N.W.2d 367, 378 (Iowa 2015) (remanding the matter for dismissal of the charge based upon insufficiency of the evidence); *State v. Brubaker*, 805 N.W.2d 164, 167 (Iowa 2011) (same).

## II. Discussion.

The marshalling instruction in this case submitted to the jury stated:

> The State must prove all the following elements of Felonious Misconduct While in Office:
> 1. On or about April, 2011 through September 10, 2012, [Pieper] was a public officer.
> 2. [Pieper] knowingly falsified a public record or document with knowledge that the writing was falsified.
> 3. [Pieper] knew the writing would become a public record of a government body.
> If the State has proved all of these elements, [Pieper] is guilty of Felonious Misconduct While in Office. If the State has failed to prove any of the elements [Pieper] is not guilty.

*See also* Iowa Code § 721.1(2) & (3) (2011) (stating that a public officer or employee commits felonious misconduct in office, a class "D" felony, if that person knowingly "[f]alsifies any public record, or issues any document falsely purporting to be a public document" or "[f]alsifies a writing, or knowingly delivers a falsified writing, with the knowledge that the writing is falsified and that the writing will become a public record of a government body"). The instructions

defined "knowingly" and related terms "knowledge" and "knew" as used in the instructions to mean Pieper "had a conscious awareness that that the public record or document was false and would be used as a public record of a government body." Public record and public officer definitions were also set out in the instructions; however, the term "falsify" was not defined therein.

The term "falsifies" is not defined in the statute, so its common and ordinary meaning applies. *See State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998). Looking to standard dictionary definitions, "falsify" means "to prove to be false; to prove false so as legally to avoid, defeat, or rectify; to make false by mutilation or addition: tamper with; counterfeit, forge, adulterate," or to "counterfeit or forge; to make something false; to give a false appearance to anything . . . to tamper with, as to falsify a record or document." *Id.* (quoting Webster's Third New International Dictionary 820 (unabr. ed. 1993); Black's Law Dictionary 603 (6th ed. 1990)). Importantly, "falsify" is a verb, which is a word used to describe an *action.* *See* Black's Law Dictionary 678 (9th ed. 2009).

Here, there is simply no evidence that Pieper acted in any way to falsify the June 2012 meeting minutes. Assuming without deciding that the information changed in the revised June 2012 minutes before the July 2012 meeting was false, the evidence does not show that Pieper made the changes or directed Ransdell to make those changes. There is no question the changes were to MEPCO's benefit, but that does not demonstrate that Pieper made those changes and thus falsified the minutes.

We agree with the reasoning of a federal court in *U.S. v. Craig*, 3 F. Supp. 3d 756, 761 (E.D. Ark. 2014). In that case, Craig was charged with falsifying a

document "after she gave it to the . . . prosecutor." *Id.* at 762. Although the evidence showed Craig gave the document to the prosecutor and represented that it was true, there was no evidence Craig made the changes that made the document false. *See id.* Essentially the same can be said about this case. Even assuming the revised minutes were false and Pieper represented that they were true, there was no evidence that Pieper was the one that made the changes or that the changes were made at his direction, as required by the statute.

In this case, it is clear the Board did not follow *Robert's Rules of Order* which would have helped ensure a proper record was created. Nevertheless, the burden was on the State to prove, beyond a reasonable doubt, that Pieper falsified the minutes. While Pieper may have had reason to do so, there was no evidence that he did. Because the evidence was insufficient to support his conviction for felonious misconduct in office, we remand the case to the district court to vacate his conviction and dismiss the case.[5]

### III. Conclusion.

Because there was insufficient evidence in the record to support the jury's verdict finding Pieper guilty of felonious misconduct while in office, we remand the case to the district court to vacate his conviction and dismiss the case.

**REVERSED AND REMANDED.**

---

[5] Because we find the argument dispositive, we do not address Pieper's other arguments.