# IN THE COURT OF APPEALS OF IOWA

No. 19-0378
Filed September 23, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JOEL GREEN CASE,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Jasper County, Thomas P. Murphy

(trial and sentencing) and Glenn E. Pille (motion to suppress), Judges.


Joel Case appeals his conviction for first-degree theft.  **AFFIRMED.**



Edward S. Fishman of Hopkins & Huebner, P.C., Adel, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.



Considered by Bower, C.J., and May and Ahlers, JJ.

**BOWER, Chief Judge.**

Joel Green Case appeals his conviction for first-degree theft, asserting there is insufficient evidence—that either the property he was selling was stolen or he knew or should have known the property was stolen—to support the conviction. He also contends the court erred by instructing the jury on aiding and abetting, in denying his request for a *Franks* hearing,[1] and in denying his motion to suppress evidence obtained upon execution of search warrants. Case alternatively asserts an ineffective-assistance-of-counsel claim. We affirm.

**I. Background Facts and Proceedings.**

Viewing the evidence in the light most favorable to the State, the jury could have found the following facts.

Over a forty-year period, Leland Mathews was involved in the vintage motorcycle community[2]—racing, collecting, rebuilding, and selling motorcycles and parts for motorcycles. He had a large collection of motorcycles, parts, and memorabilia—particularly Ossa, Hodaka, and SWM brands.[3] Mathews was well

---

[1] *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) (holding "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request").

[2] Testimony at trial indicated vintage motorcycles are those that were built between 1910 and 1980.

[3] Ossa was a Spanish company that built motorcycles from 1924 to 1987. Mathews was most interested in Ossa motorcycles of the late 1960s to early 1970s. Hodaka motorcycles were built in Japan, and SWM was an Italian brand. Mathews also had other vintage motorcycles and parts, including those built by Can-Am (Canadian), Kami (Chinese), and Gilera (Italian).

known in the vintage motorcycle community and was considered one of the country's largest collectors of Ossa and Hodaka motorcycles and parts.

Dan Trampel had known Mathews for more than forty years. Trampel and Mathews rode motorcycles together throughout the years, and like Mathews, Trampel collects Ossa, Hodaka, and SWM motorcycles. Trampel referred to Mathews as the Midwest's "aggregator" of parts for Ossa, Hodaka, and SWM motorcycles. Mathews was also a mentor to other motorcycle enthusiasts, teaching them to build and repair their own motorcycles and allowing them to work in the shop in exchange for parts. Among those he mentored was Nicholas Bollenbaugh.

Mathews started Iowa Wheel Sports in Des Moines in 1975. In 1979, he and his then-wife Kathy moved the shop and themselves to Colfax, Iowa. While the shop was in Colfax, Bollenbaugh spent a considerable amount of time working with Mathews.

Mathews and Kathy divorced in 2001. A provision of their dissolution decree allowed Mathews to keep his motorcycle shop on the same premises for a time. Then, Mathews moved some of his collection across the road to a barn on his sister's Colfax property.[4] Mathews moved much of his Hodaka parts collection to Des Moines, where he rented a space from another motorcycle enthusiast, Jeff Jarnagin.

Mathews's physical and mental health began to deteriorate, and he consolidated his collection in 2009 onto a rural property outside of Baxter, Iowa

---

[4] His sister, also Kathy Mathews, was in a long-term relationship with Mike Retman, the father of Christopher Retman, a co-defendant of Case.

(hereinafter "the Garnet property"). There, in a large red and white barn, he created a space he intended as a showroom for his better motorcycles and built shelving for his extensive inventory of used and "new old stock" (NOS) parts. Several people assisted Mathews in moving and setting up the shop, all of whom were familiar with Mathews's extensive collection including, Trampel, David Phillips, Curt Leaverton, and Bollenbaugh. In a lower barn, Mathews kept "junk" motorcycles and other parts. Mathews placed more important memorabilia and collectibles in the house on the property.

Leaverton had known Mathews since 1978 and had been in the aftermarket motorcycle-parts business for many years. Leaverton collected the same "unusual combination" of motorcycles as Mathews—Hodakas, Ossas, and SWMs. He stated that when Mathews moved to the Garnet property it was "the first time that the collection had been completely put back together in quite some time" and estimated the collection would be valued between $300,000 and $500,000.

In 2014 and 2015, Adam Krueger—a mechanic who restored vintage motorcycles—helped Mathews with arranging the parts inventory and trying to get him set up to sell some items online. Krueger also worked with Mathews on motorcycles.

On September 27, 2016, Jasper County Deputy Sheriff Jeremy Dittmer responded to a report of a burglary at the Garnet property. The report had come from Mathews,[5] who gave Deputy Dittmer a partial list of property that was missing, which included a truck toolbox with miscellaneous hand tools; several toolboxes

---

[5] Caroline Irons, Mathews's longtime companion, was also there.

with tools; truck tires; riding lawn mower; push mower; three-wheel trike bike; oxygen tank and torch kit; nineteen-foot tandem axle trailer; several Hodaka project motorcycles; a 2007 Victory motorcycle; and miscellaneous Hodaka motorcycle parts. Mathews said this was a partial list and he would try to identify everything that was missing and provide an updated list. Deputy Dittmer walked through the red and white barn and saw that various "boxes and totes . . . looked like as if they had been opened or picked through." Unfortunately, Deputy Dittmer did not take pictures of the property. Mathews told the deputy his last visit to the Garnet property had been about two weeks before. After taking the initial report, Deputy Dittmer turned the investigation over to Jasper County Detective Jeremy Burdess. Mathews did not follow up with a more detailed list of missing items.

When Mathews and Irons returned to the Garnet property two weeks later, despite having barricaded the front door, the back door to the red and white barn had its padlock cut off and the barn had been burgled again. This time, empty boxes were strewn about, and much of the inventory was gone. The house had also been broken into and items taken. News of the theft spread among the vintage motorcycle community.

At some point in September 2016, Muscatine resident Donald LaRue, who had known Mathews since 1992 or 1993, received a message from another motorcyclist, Pat Ball. Ball told LaRue he had "a buddy that bought a storage unit that has a bunch of Ossa parts" and asked if LaRue was interested. LaRue told Ball to contact Mathews. Ball sent LaRue seventy to ninety pictures of Ossa parts. The seller asked for $600 to $800. When LaRue responded it looked like Mathews's collection, Ball "took a long time to" respond. Because LaRue did not

have Mathews's current phone number, he called Leaverton and asked if Mathews had put his stuff in a storage unit. LaRue also forwarded some of the photos to Leaverton, who recognized items from Mathews's collection, including a "one-of-a-kind" exhaust pipe made specifically for Mathews. Leaverton said he would follow up. He contacted Mathews and law enforcement.

On January 3, 2017, Christopher Retman, driving a white van, went to Krueger's motorcycle shop in Mitchellville and asked if he was interested in buying a SMW hill climber. Krueger's interest was "sparked . . . because there aren't that many SMW's out there, let alone hill climbers." And, Krueger had recently learned of the theft at the Garnet property from Leaverton. Retman said he also had Hodaka and Ossa motorcycles and parts. Krueger gave Retman his phone number.

On January 5, Krueger got text messages from Case along with dozens of photos of motorcycles and parts he offered to sell. Krueger recognized several of the motorcycles, two of which he believed to be his own, which were stored at Mathews's Garnet property. Krueger also recognized Mathews's Ossa hill climber, as well as the types of boxes containing parts, particular motorcycle tanks, and seats. Case texted the pictures were "[n]ot even close and still there is more." When Krueger asked Case whose property was in the pictures, Case responded they belonged to him and Retman. Krueger called Detective Burdess because "I believed [the items] to be stolen from my friend Leland Mathews."

On January 6 or 7, Case went to Krueger's shop in Mitchellville. Case was in a red pickup truck that had two motorcycles in the bed. Krueger stated he was

interested in purchasing some of the items and asked what Case would want for "the lot." Case mentioned "six figures."

Case came to Krueger's shop a second time, again in a red pickup truck. Christina Britt was with Case on this occasion. Case had a load of motorcycle tanks with him and left a SWM tank with Krueger.

On January 8, Detective Jeremy Bassett was on a routine patrol in Pleasant Hill, Polk County, checking storage units. At about 1:00 a.m., Detective Bassett was driving past storage units and saw a man and woman unloading items from a red Chevrolet truck into a unit. He could not see much, but he did see the man carrying a "yellow milk crate" that had "several small gauges" inside. Detective Bassett asked the couple for identification, Case identified himself by name and date of birth but stated he did not have an ID. Britt supplied her Iowa driver's license. Detective Bassett continued on his patrol and noted the encounter on a daily log. He thought nothing more of the encounter until a later briefing concerning a theft in which Case's and Britt's names came up. He then contacted Detective Burdess.

On January 17, Case and Retman arrived at Krueger's shop in the same white van Krueger had previously seen Retman in. Case and Retman told Krueger they had recently been moving parts to a storage unit, and they arranged to meet there. On his way to the Pleasant Hill storage unit, Krueger called Detective Burdess.

Using the information from Detective Bassett and Krueger, Detective Burdess filed applications for and obtained search warrants for storage units C20 and D43 at the Pleasant Hill storage facility.

Krueger met Case and Retman at storage unit C20, which was filled from floor to ceiling with boxes of parts, some yellow milk crates containing parts, and distinctive product signage Krueger recognized from Mathews's Garnet shop. While the three were looking at the items, police arrived with a search warrant for the storage units. Unit D43 contained ten motorcycles and "a couple boxes and totes of parts." The motorcycles were Ossas, a Gilera, a Hodaka, an SWM, a Kawasaki, and a frame with a distinctive "Jesus" sticker. Everything in the two storage units was seized and taken to the sheriff's office.

Detective Burdess contacted Mathews after the storage units were searched and asked him to come to the sheriff's office to look at the items seized. Mathews, Irons, and Krueger arrived, and Mathews indicated some of the parts and motorcycles belonged to him.

Knowing Case's mother lived in Colfax, Detective Burdess drove by that property. He "observed some motorcycles underneath a tarp outside and a stack of motorcycle tires that appeared to be off-road tires matching the type of motorcycles that we were dealing with." He obtained a search warrant for the Colfax property, which was executed on January 20. Case and Britt were living at the property, as were Case's mother and stepfather. In the garage, officers found motorcycle parts and a row of motorcycles, including vintage motorcycles (a Can-Am 500[6] and Hodaka, SWM, and Ossa motorcycles) as well as more modern motorcycles. One motorcycle had its VIN removed. There were extra parts,

---

[6] The gas tank appeared to have been painted.

indicating motorcycles were being repainted or rebuilt. All motorcycle-related items were seized. [7]

Law enforcement also noted on the Colfax property a red Chevy pickup truck registered to Britt. On the dashboard was an illustrated parts list for a Hodaka motorcycle, paperwork for a Hodaka Road Toad, and a motorcycle muffler and seat frame were in the bed of the truck.

The same date the warrant was issued at Case's residence, Retman arrived at Krueger's Mitchellville shop and asked Krueger what happened. Krueger told Retman he did not know. Retman "proceeded to tell [Krueger] that he's going to start showing up in the middle of the night at people's houses to knock skulls together to get some answers."

Mathews was again invited to the sheriff's office to view the items seized at the Colfax property. Krueger and Iron accompanied him. Mathews indicated some of the property belonged to him.

Others connected to Mathews also viewed the seized property in the sheriff's office and identified specific items that belonged to them that had been stored at Mathews's barn.

After the seizure of items from the storage units and Colfax property, Detective Burdess asked Deputy Dittmer to investigate an eBay account that was listing motorcycle-related items for sale. Deputy Burdess believed Britt was the seller and asked Deputy Dittmer to attempt to purchase one of the items being offered. Deputy Dittmer did complete a transaction on eBay to purchase a

---

[7] After proof of ownership was presented by Case's stepfather, police returned Yamaha, Kawasaki, Suzuki, and Honda motorcycles.

motorcycle manual. However, eBay notified Deputy Dittmer the next day the transaction had been cancelled by the seller, and his money was refunded.

Case, Britt, and Retman were charged with first-degree theft, in violation of Iowa Code sections 714.1(4) and 714.2(1) (2017). The defendants filed a motion to suppress evidence seized during the warranted searches of the two storage units in Pleasant Hill and the Colfax residence, claiming there was not probable cause to support the warrants. In an amended motion to suppress, the defendants requested a *Franks* hearing, contending, "Through depositions, it is clear that the person making the application for the search warrant either purposely or reckless [sic] disregarded the truth in the affidavit in support of the application for the warrant."

The district court denied the request for a *Franks* hearing and the motions to suppress.

A jury trial was held on December 5, 6, 7, and 10, 2018. However, Mathews had died before the trial began. A number of witnesses testified about Mathews's lifelong collection of motorcycles and parts and identified specific items seized as belonging to Mathews or themselves, though some of the motorcycles had been altered and parts removed, replaced, or painted.

Krueger testified he had worked with Mathews in 2014 and 2015 in exchange for motorcycles. He stated he learned of the Garnet property theft from Leaverton in late December 2016 or early January 2017 before Retman approached him. Krueger identified two motorcycles among the seized property as being ones he had "purchased" by working for Krueger but that had remained at the barn. He identified an Ossa hill climber was Mathews's own. He testified a

specific motorcycle that was missing a motor was from Mathews's lower barn. He stated, "Well, the Hodaka 250 was not around. It was at the end of Hodaka's manufacturing. There aren't very many of these in the United States, let alone in the world. So to see one of these and own one in any various form is kind of rare." He also confirmed a number of other items belonged to Mathews. Krueger acknowledged he had not been at the Garnet property between September 2016 and January 2017 but when he visited after learning of the burglary Mathews told him he had not sold to anyone for at least three years.

Bollenbaugh testified he started working for Mathews at the Colfax shop in 1997 when he was thirteen years old and remained friends with him until his death. Bollenbaugh testified he helped move Mathews's collection to the Garnet property in 2009 and he stored personal items there, including two SWM motorcycles. One of the motorcycles had a red frame, black fenders, and race number plate of 239. Bollenbaugh testified the motorcycle was "rare" because he built it himself, raced it, and had it in the background of his high school graduation photo. A number 239 SWM race plate was found in storage unit C20, and Bollenbaugh identified his red-framed SWM motorcycle in a photo of motorcycles located in storage unit D43.

Leaverton testified that he had been a producer and dealer of aftermarket Ossa parts for a number of years. He testified as to the value of individual parts (NOS and used) located at the sheriff's office. The value of pistons, signs, seats, tanks, and other parts he identified exceeded $10,000. Leaverton also identified three of the motorcycles seized as Mathews's SWM hill climber, valued at $1200; Ossa GPIII, valued at $1200; and Can-Am motorcycle, valued at $4000. When

asked the value of all the items he viewed being held at the sheriff's office, Leaverton estimated a value of $75,000 to $100,000.

Leaverton also testified Mathews had been storing a "fairing"[8] for him, which he identified at the sheriff's office. The fairing was signed on the underside by a famous motorcycle racer with a notation of the race in which it had been used.

Trampel testified he assisted Mathews in making an insurance claim after the burglary. The parts stolen were insured personal property and were valued at $535,000.[9] Trampel viewed the items at the sheriff's office and recognized a number of items being from the Garnet property. He recognized his own handwriting on plastic totes and boxes; Mathews's and his family's handwriting on several boxes of parts; and the packaging around a sign because he had wrapped it before the move to the Garnet property. He identified a file cabinet that had been in the Garnet shop, a rare 1966 Gilera motorcycle (Mathews had three), and a gas tank to a motorcycle Trampel knew belonged to Mathews's daughter as a child.

Jarnagin also identified items in the sheriff's office as belonging to him that had been stored at the Garnet property: the frame, controls, forks, front wheel, foot pegs and other parts of a Hodaka Combat Wombat motorcycle and the remains of another Hodaka with a gas tank with a "Jesus" sticker that had "a lot of parts removed from it." Jarnagin testified he had intended to build one complete motorcycle. Those items had all been removed from storage unit D43.

---

[8] A fairing is a customized covering for the tank of a racing bike.

[9] Trampel testified that there had been fifty or sixty motorcycles stolen as well the parts and memorabilia, but those were not insured as personal property. He testified, "probably what was most amazing to me is that almost none of the motorcycle stock was recovered."

Mathews's daughter, Susan Greenwood, testified her father passed away in February 2018.  She was born in 1985, grew up in Colfax, and was always around motorcycles.   She testified Mathews was "very passionate" about motorcycles, "It was his hobby.  His second job.  It was everything to him."  As a child, Greenwood traveled with Mathews to races, events, and swap meets.  The last time she had been at the Garnet property was in 2009 when she was helping him design the space.  She continued to speak with her father but did not have occasion to go to the Garnet property again.

Greenwood identified a number of items held in the sheriff's office as coming from her father's collection and noted it was her handwriting on several of the parts boxes.  She also identified a gas tank and seat from her own motorcycle, a SWM 50, which she testified was a "very rare bike" Mathews kept in pristine condition in a show case.  Greenwood testified she had not heard of Case or Britt, but she knew of Retman since his father is "my dad's sister's significant other."

Greenwood also testified:

> Q. In relation to this case, did you ever do any looking around on the internet to see if you could find some parts that may be your father's?  A. I did.
> Q. And did you ever locate some that you believe were his?  A. I did.
> Q. Where did you—What site did you find this?  A. eBay.
> Q. And did you find any particular eBay member that was selling these items?  A. I did.
> Q. And do you remember that—the member's name?  A. It was like J. Green something.  It was based out of Colfax.  Which I found interesting.  There were some numbers that followed it, but I don't remember.
> Q. And what type of items did you see for sale?  A. Motorcycle parts of the Ossa, Hodaka brand.  Some literature.  In particular, one of the Gilera manuals.  There were some full bikes at one time as well.

Q. And what time of—are we talking about? What time of year or when? A. It's still—There are still parts being sold currently under that name. But I noticed it first, you know, after my father's death.

Case and his co-defendants moved for a directed verdict, contending there was insufficient evidence to establish either that the items seized during the execution of the search warrants had been stolen from Mathews or that the defendants knew or should have known the items were stolen. They asserted there was no direct evidence of what items were stolen from the Garnet property or when the theft occurred. Moreover, they contended the four-month span between Mathews's report of a burglary and the defendants' possession of items that are often sold and purchased at swap meets and on-line did not support an inference the defendants should have known they were stolen.

The court denied the motions for directed verdict. The defendants rested without presenting evidence. They renewed their motions for directed verdict, which were again denied.

The court provided proposed jury instructions and verdict forms. Counsel for Retman objected to the inclusion of a jury instruction on adding and abetting, asserting, "I recognize that the State pled that in its original charging document, the trial information, but I don't believe there is sufficient evidence to submit this case on a theory of aiding and abetting. And so would object to Instruction No. 18." Case and Britt joined in that objection. The court overruled the objection.

The jury returned a general verdict finding each of the defendants guilty of first-degree theft.

Case appeals, asserting (1) there is insufficient evidence the property he was selling was stolen or he knew or should have known the property was stolen.

He also contends the court erred (2) by instructing the jury on aiding and abetting, (3) in denying his request for a *Franks* hearing, and (4) in denying his motion to suppress evidence obtained upon execution of search warrants.

## II. Scope and Standard of Review.

We review sufficiency challenges for correction of errors at law. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). We also review challenges to jury instructions to determine whether the challenged instruction accurately states the law. *State v. Shorter*, 945 N.W.2d 1, 6 (Iowa 2020).

We review de novo challenges to a ruling on the merits of a motion to suppress. *State v. Baker*, 925 N.W.2d 602, 609 (Iowa 2019).

## III. Discussion.

*A. Sufficiency of the evidence.*

In assessing the sufficiency of the evidence, "[w]e view the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. "[W]e will uphold a verdict if substantial evidence supports it." *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). Evidence is substantial "if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted). In considering a sufficiency-of-the-evidence challenge, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters

are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (citation omitted).

As the jury was instructed,[10] the State here was required to prove:

> (1) Leland Mathews's property was stolen.
> (2) On or about the 17th and 20th days of January, 2017, Mr. Case, Ms. Britt, and Mr. Retman exercised control over the property.
> (3) At the time, Mr. Case, Ms. Britt, and Mr. Retman knew the property had been stolen.
> (4) Mr. Case, Ms. Britt, and Mr. Retman did not intend to promptly return it to the owner or to deliver it to an appropriate public officer.

Case's brief challenges the sufficiency of the evidence supporting the first and third elements.

Viewing the evidence in the light most favorable to the State, there is substantial evidence a large part of Mathews's Garnet motorcycle parts and vintage motorcycle collection was stolen around the time Mathews reported the burglary to the sheriff. While Mathews did not provide a complete list and, in fact, did not keep a detailed inventory of his collection, Mathews did report specific items as taken to Deputy Dittmer including Hodaka parts and project motorcycles. When Mathews viewed the items at the sheriff's office that had been removed from the storage units and Colfax residence, he identified specific items as belonging to him. Krueger, Trampel, Irons, Greenwood, Kathy Mathews, Jarnagin, Bollenbaugh, Phillips, and Leaverton all identified specific motorcycles, parts, boxes, and memorabilia at the sheriff's office that came from Mathews's collection.

---

[10] When a jury is instructed without objection, the jury instructions become "the law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes*, 910 N.W.2d 634, 640 (Iowa Ct. App. 2018). Case did not object to the marshalling instruction, so it is the law of the case. *See id.*

In addition, Mathews told Krueger he had not sold anything for three years. There is substantial evidence to support the first and second elements.

On the question whether Case knew the property he possessed had been stolen, case law provides that "[k]nowledge can be inferred from a defendant's unexplained possession of an item that was recently stolen." *See State v. Stephen*, 537 N.W.2d 792, 794 (Iowa Ct. App. 1995). Case makes much of the four-month gap between the reported burglary and offer to sell the items to Krueger. He argues the inference of "recently stolen" property is improper here.

> "Recent" discovery of possession is not necessarily measured by the number of hours or days or weeks involved. The nature of the articles, and the circumstances of the case are pertinent elements. The length of time is a question to be considered by the jury together with all other factors in the case.
> As to the character of the stolen goods it depends to some extent on whether they are readily and easily transferable; light or heavy; easy or hard to identify.

*State v. Brightman*, 110 N.W.2d 315, 317 (Iowa 1961) (citations omitted) (finding a jury question was involved despite a five-month interval between burglary and defendant's possession). As observed in *State v. Stanton*:

> Whether recent enough to warrant the inference of guilt necessarily depends on the circumstances of each particular case. The strength or weakness of the inference to be drawn from possession depends on the time lapsed between the commission of the offense and possession by the accused, the nature of the property stolen, where and how taken, the manner of such possession, and other conditions disclosed. As the time between the larceny and the possession is enlarged, the necessity of additional evidence appears, and in some cases the fact of possession may be but a slight circumstance indicative of guilt, and there may be cases where the court should instruct the jury that something more than possession must be shown to justify conviction.

154 N.W. 762, 762–63 (Iowa 1915).

In light of the great number of the items found in the defendants' possession identified as coming from Mathews's collection,[11] the vintage nature of the items, and the familiarity of many people with the collection and the burglary, the jury could infer Case knew or should reasonably have known the property he possessed was stolen. Other circumstances that tend to support the inference of guilty knowledge include: the fact that motorcycles were altered and painted, Case and Britt were moving parts into a storage unit at 1:00 a.m., and Retman appeared at Krueger's after items were seized by law enforcement and made threats of bodily harm. While no one circumstance might be sufficient alone, the jury could consider all the circumstances together and reasonably conclude Case "knew the property had been stolen."

Case also asserts that the jury was permitted to find him "guilty based on [his] lack of explanation on how he came into possession of the property," violating his due process rights. He cites *State v. Taylor*, 238 N.W. 457, 458 (Iowa 1931), which reversed a larceny conviction that placed the burden on the defendant to prove his innocence. The case is not on point. There, the court specifically instructed the jury, "[T]he burden of explaining the recent possession of stolen property is on the defendant, . . . and he must prove by a preponderance or greater weight of the evidence that such possession was honestly acquired." *Taylor*, 238 N.W. at 458. The instructions given here placed the burden squarely on the State. *See State v. Gillam*, 300 N.W. 567, 569 (Iowa 1941) ("[T]aking the court's instructions as a whole, there was laid upon the state its proper burden of proof.").

---

[11] There was testimony it required several truckloads to move it all to the sheriff's office, and photos show how much was involved.

*B. Challenge to jury instruction.*[12]

To support an aiding-and-abetting theory, "the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission." *Shorter*, 893 N.W.2d at 74–75 (citation omitted). Case asserts, "There was not substantial evidence that [he] had knowledge of a criminal act at or before its commission." He maintains there no evidence he knew he was in possession of stolen property or that Retman or Britt were in possession of stolen property. We have already rejected his claims of insufficient evidence.

With respect to the evidence supporting the aiding-and-abetting theory, we note Retman first contacted Krueger in person and offered to sell items; Krueger

---

[12] Instruction No. 18 states:

> All persons involved in the commission of a crime, whether they directly commit the crime or knowingly "aid and abet" its commission, shall be treated in the same way.
>
> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the Defendants' earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting". Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting".
>
> The guilt of a person who knowingly aids and abets the commission of a crime must be determined only on the facts which show the part he has in it, and does not depend upon the degree of another person's guilt.
>
> If you find the State has proved Mr. Case, Ms. Britt, and Mr. Retman directly committed the crime, or knowingly "aided and abetted" another person or persons in the commission of the crime, then Mr. Case, Ms. Britt, and Mr. Retman are guilty of the crime charged.

gave him his phone number. Two days later, Case (who did not know Krueger) called the number and offered to sell items. Case stated the items belonged to him and Retman. Case then appeared with Britt at Krueger's shop and again offered items for sale. Case and Britt were observed putting a crate of what Detective Bassett described as gauges into a storage unit at 1:00 a.m. Shortly thereafter, Case and Retman told Krueger they had been moving parts to a storage unit, led Krueger to the same storage facility where Case and Britt had been seen, and showed Krueger two units filled with items later identified as having been from Mathews's collection. Britt and Case were also selling vintage motorcycle items on eBay even after all the items had been seized from the two storage units and Case and Britt's Colfax residence. A jury question was presented as to whether the defendants "knowingly approve[d] and agree[d] to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed." We find no error.

*C.* Franks *hearing and probable cause.*

We deal with these issues together. Case contends the officer applying for the search warrants included false statements and omitted material facts from the application. He argues that without these misrepresentations, there is not probable cause to support either search warrant.

Our review of probable cause determinations is normally limited to the information reduced to writing and presented to the judge or magistrate in support of a warrant application. *Baker*, 925 N.W.2d at 613–14. In our de novo review, we evaluate the totality of the circumstances, giving deference to but not being bound by the district court's findings of fact. *Id.* at 609.

In *Franks*, the Supreme Court developed a means to examine truthfulness of an affiant in presenting evidence to a magistrate supporting issuance of a search warrant. [Our supreme] court adopted the *Franks* standard in *State v. Groff*, 323 N.W.2d 204, 206–08 (Iowa 1982). The inquiry adopted by *Franks* is limited to a determination of whether the affiant was purposely untruthful with regard to a material fact in his or her application for the warrant, or acted with reckless disregard for the truth. If the court finds that the affiant consciously falsified the challenged information, or acted with reckless disregard for the truth in his or her application for the warrant, the offensive material must be deleted and the remainder of the warrant reviewed to determine whether probable cause existed. Allegations of negligence or mistake are insufficient to sustain an assault on the warrant, and only impeachment of the affiant is permitted, not that of a nongovernmental informant.

*State v. Niehaus*, 452 N.W.2d 184, 186–87 (Iowa 1990) (citations omitted).

In *Groff*, the supreme court stated that to warrant a *Franks* hearing, a defendant must "ma[k]e a preliminary showing under oath that the affiant [of a warrant application] included false statements in the affidavit." 323 N.W.2d at 208. And in *State v. Seager*, 341 N.W.2d 420, 425 (Iowa 1983), our supreme court stated, "[U]nder *Franks*, intentionally false statements and false statements made with a reckless disregard for the truth are treated the same." The issuing magistrate must have been misled "into believing the existence of certain facts which enter into [her or] his thought process in evaluating probable cause." *Groff*, 323 N.W.2d at 210.

Here, Case claimed the following statement on the search warrant application was false: "On September 27, 2016, Leland Matthews of 7920 Garnet Avenue [reported] a burglary to his property. Theft of numerous items from a shop on the property. Most significantly, were several rare motorcycles and motorcycle parts, including brands such as Ossa, Hodaka, and SWM." Case argued that Mathews's written list did not mention Ossa or SWM brands. He also argued the

warrant omits information including: Krueger did not have a list of items stolen from Mathews, when the last time Krueger saw the Mathews collection was, whether Mathews ever told Krueger what had been taken, whether it is possible to distinguish one rare motorcycle part from another, and whether Case was trying to sell Hodaka, Ossa, and SWM parts.

The district court properly considered whether the defendants had shown they were entitled to a *Franks* hearing and concluded:

> [T]he defendants have failed to make a substantial preliminary showing to the court's satisfaction that the affidavit supporting the search warrant applications contained deliberate falsehoods or statements made in reckless disregard for the truth. The challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. In this case, the defendants have made no preliminary showing regarding the integrity of the affidavit. They have raised the veracity issue in only conclusory terms. There have been no specific allegations of falsity. The court is not satisfied either "deliberate falsehoods or statements made in reckless disregard of the truth" have been preliminarily shown. Every item stolen does not need to be listed in the Incident Report before it can be relied upon by the affiant in his affidavit. Here, as mentioned, the affiant was made aware of items not listed in the original Incident Report from other sources. The affiant had spoken directly with Adam Krueger who was familiar with the items and identified them as part of what was stolen from Leland Mathews. To the extent defendants' argue there was negligence or innocent mistake in not including specific items in the Incident Report, the case law clearly indicates such are insufficient.
>
> Lastly, even were the court to agree with the defendants that the inclusion of Ossa and SWM motorcycle parts should be stricken, there is nonetheless, independently, still probable cause for the issuance of the search warrants. The basis for probable cause is clearly established from the statements attributed to Adam Krueger that he had been approached by defendant Joel Case about buying a large quantity of rare motorcycle parts and that through pictures and some firsthand items as well as verbal descriptions of others, he recognized the items as those stolen from Leland Mathews. Mr. Krueger, of MX Motorcycle in Mitchellville, was very familiar with the stolen items as he had, worked for and traded in, the same

motorcycles and parts as the victim, Mr. Mathews, and could identify them.

We agree with the district court, Case failed to make a preliminary showing to warrant a *Franks* hearing. *See Baker*, 925 N.W.2d at 615 ("[A]n officer applying for a search warrant is not required to present all inculpatory and exculpatory evidence to the magistrate, only that evidence which would support a finding of probable cause." (alteration in original) (citation omitted)).

We also conclude the information provided to the magistrate was such that "a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there." *See id.* at 613 (citation omitted). Consequently, we conclude probable cause exists for the search warrants. "[W]e do not make an independent determination of probable cause," we merely determine "whether the issuing judge had a substantial basis for concluding probable cause existed." *State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015) (citation omitted).

Many of Case's objections are essentially a claim of a lack of detail, which is not required to the extent argued. "In reviewing the warrant application, we interpret the affidavit of probable cause in a common sense, rather than in a highly technical manner. We draw all reasonable inferences to support the judge's finding of probable cause and decide close cases in favor of upholding the validity of the warrant." *Baker*, 925 N.W.2d at 614 (internal citation omitted).

Case raises additional challenges to the search warrant not raised below. He contends we should address his claims under the rubric of ineffective

assistance of counsel.[13]  "To establish [a] claim of ineffective assistance of counsel, [a defendant] must demonstrate (1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice."  *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006); *accord Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  We decline to address the unpreserved claims here.  *See State v. Trane*, 934 N.W.2d 447, 465 (Iowa 2019) (noting ineffective assistance of counsel claims are normally preserved for possible postconviction proceedings).

We affirm.

**AFFIRMED.**

---

[13] The Iowa legislature recently amended Iowa Code section 814.7, eliminating direct-appeal ineffective-assistance-of-counsel claims.  Iowa Code § 814.7 (Supp. 2019).  However, this amendment "do[es] not apply to cases pending on July 1, 2019." *State v. Macke*, 933 N.W.2d 226, 235 (Iowa 2019).  Because Case's appeal was pending before July 1, 2019, the amendment does not apply.