# IN THE COURT OF APPEALS OF IOWA

No. 23-0623
Filed May 22, 2024

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**MARK DAVID RUSSELL,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Webster County, Angela L. Doyle,

Judge.


      A defendant appeals his conviction for first-degree murder.  **AFFIRMED.**


      Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

      Brenna Bird, Attorney General, and Richard Bennett, Assistant Attorney

General, for appellee.


      Heard by Bower, C.J., and Tabor, Greer, Schumacher, and Chicchelly, JJ.

**GREER, Judge.**

After learning that Angela McLeod died as a result of an altercation with him, Mark Russell responded, "I'm sorry to hear that, but at the same time, what would you do if somebody did this to you and just made your life a living hell?" Now on appeal from the subsequent first-degree-murder conviction, Russell argues that he was using reasonable force against McLeod and thus the State presented insufficient evidence to convict him. Upon our review, we affirm.

**I. Background Facts and Prior Proceedings.**

Melissa McKinley allowed her mother, McLeod, to stay at McKinley's one-bedroom apartment to recover from her abdominal surgery. As a result of the surgery, McLeod had a drain tube in her side as well as an incision that crossed her lower abdomen; she had been staying at McKinley's place for a few weeks. McKinley slept in the living room. McKinley also allowed Russell to stay at the apartment for a few days while McLeod was there. McLeod was forty-five years old and Russell was twenty-eight.

One evening, while all three were at the apartment, Russell and McLeod used methamphetamine. The next morning, they got into a dispute. Russell was in the living room, and McLeod was in the bedroom. McLeod called Russell "the N-word," scum, and a bastard. In reaction to their verbal exchanges, Russell said that McLeod was not going to leave the bedroom alive and broke McLeod's cell phone. McLeod called law enforcement, who came to the home and instructed Russell and McLeod to end the altercation or they would "remove someone." Law enforcement left. The dispute escalated, and McLeod, standing in the bedroom doorway, raised a golf club—a driver—over her right shoulder as if to swing it.

McKinley was standing between Russell and McLeod; Russell pushed McKinley out of the way and rushed into the bedroom. Russell grabbed the golf club.

McKinley saw McLeod fall on the dresser in the bedroom and called 911. She told the operator the she needed an officer, and that officers had already been at the apartment once. As McKinley was talking to the operator, there was screaming in the background from both Russell and McLeod. McKinley hung up and ran outside the apartment. She called 911 again and told the operator that she needed someone as soon as possible and she could hear McLeod crying inside the bedroom. She added that McLeod "might be dead. Like, he's hurting her." McKinley ended the call by saying, "so I don't know if she's dead or not already."

Fort Dodge Police Officer Matthew Weir responded to the scene first. After entering the apartment, Officer Weir observed Russell shirtless and out of breath. He then noticed McLeod face down on the floor of the bedroom. McLeod had a towel tied around her head that was covered in blood. Officer Weir handcuffed Russell and told him he was being detained. As Officer Weir attempted to enter the bedroom, Russell told him, "She kept doing it to me. She kept doing it to me, over and over and over." Officer Weir forced the bedroom door open and began performing chest compressions on McLeod, but she was unresponsive; Russell had no visible injuries.

Lieutenant Joseph Bates also responded to the scene and placed Russell in the back of Officer Weir's squad car. After getting into the back seat, Russell told Lieutenant Bates, "I'm sorry, sir." When Lieutenant Bates asked for clarification, Russell elaborated: "What I just did to her." Lieutenant Bates

responded, "What—what did you do to her?"  Russell answered, "I beat the shit out of her."  Lieutenant Bates asked, "Why?" and Russell explained, "'cause she kept enticing me this whole time, sir."  Lieutenant Bates came around the side of the squad car, opened the rear passenger door, and asked Russell, "K, so you did what?"  Russell detailed that he "beat her.  I beat her with a golf club.  And then she tried to fucking roll over and choke on her own blood."  He ended by saying that McLeod "tried to fuck me over this whole time."

Officer Weir transported Russell to the police station where Detective Evan Thompson began interviewing him.  In the interview, Russell insisted that McLeod had been "enticing" him.  He said McLeod "just kept—kept going."  He also claimed that she threatened to get "her boys" to come and beat him.  On the day of the altercation, Russell believed that he and McLeod argued for around thirty minutes while he "waited.  Like, I'm super calm.  That's the bad thing, too.  I'm calm."  At the same time, he thought, "I'm about to kill this girl.  She keeps fucking with me.  Like, I'm trying not to, but if she wants to test me, and play this shit, then hell yeah."  He insisted that he did not just snap, but after five more minutes, McLeod tried to hit Russell with the golf club.  McLeod missed, and Russell took the golf club from her and began choking her.  He then began hitting her with the golf club, including in the mouth, and she began choking on her own blood.  Russell rolled her over to stop her from choking.  McLeod never managed to hit Russell with the golf club.  Russell said that he could not let anyone disrespect him like McLeod did and he could not have walked away because "it was already past that point."  He also said, "[S]he asked for everything she got."

Photographs taken right after the altercation showed McLeod's blood on the floor and walls of the bedroom, the side of the dresser, and the doors to the bedroom and to the living room. Russell had McLeod's blood under his middle fingernails and on his face. An autopsy performed the next day revealed at least seven blows to McLeod's head consistent with contact from either the head or the shaft of a golf club; one hit was forceful enough that it caused a goose egg. The autopsy also found at least seven of the same type of blunt force injuries to McLeod's torso, arms, and back of her hands along with methamphetamine and amphetamines in her urine. Further investigation uncovered cuts inside McLeod's mouth and a ceramic or plastic ring embedded in the back of her skull; the ring was the same diameter as the broken shaft of the golf club and had most likely been forcefully pushed from a golf club through the palate of McLeod's mouth into the back of her skull. The shaft of a golf club recovered from McKinley's apartment had McLeod's blood on it. The medical examiner who performed the autopsy concluded that McLeod's cause of death was blunt force injuries to her head.

The State charged Russell with first-degree murder, a class "A" felony, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2020). Russell filed notice of his intention to rely on the affirmative defense of self-defense. *See* Iowa Code § 704.3. Following the presentation of evidence,[1] Russell moved for a judgment of acquittal, arguing that the State had failed to prove that he was not acting with justification; the court overruled the motion. The jury found Russell guilty as

---

[1] Trial was delayed by the scheduling and completion of three competency evaluations. There was also a previously scheduled trial that ended in a mistrial, and the court granted a change of venue from Webster to Cerro Gordo County, where Russell's trial was ultimately held.

charged. Russell moved for a new trial, which the court denied. The court sentenced him to life imprisonment without the possibility of parole. Russell appeals.

**II. Standard of Review.**

We review the sufficiency of the evidence supporting a conviction for correction of errors at law. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). In conducting our review, we consider the evidence in the light most favorable to the verdict, "including all reasonable inferences that may be fairly drawn from the evidence." *Id.*

**III. Analysis.**

Unchallenged jury instructions become the law of the case for purposes of our review of sufficiency of the evidence. *State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020). The jury instructions here required that the State prove that Russell "was not acting with justification." The instructions further defined the force employed by Russell as justified if he "reasonably believed that such force was necessary to defend himself or another from any actual or imminent use of unlawful force that he reasonably believed was being or would be imminently perpetrated by . . . McLeod." Regarding deadly force, the instruction laid out that:

> [r]easonable force can include deadly force if it is reasonable to believe that such force is necessary to resist a like force or threat, prevent or terminate the commission of a forcible felony, or avoid injury or risk to one's life or safety or the life or safety of another.

However, deadly force is not justified if Russell "used unreasonable force under the circumstances." Russell argues that the State failed to present substantial

evidence of this last element of first-degree murder—the lack of justification for his use of deadly force.[2]

"Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019) (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "[T]he evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2013) (quoting *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002)). Once the defendant has produced evidence supporting an affirmative defense, the burden is on the State to prove each of the elements of an offense, including that justification did not exist. *State v. Bailey*, 2 N.W.3d 429, 434 (Iowa 2024).

Under Iowa law, when a person starts a conflict or escalates it, their use of force is not justified. *See* Iowa Code § 704.6; *State v. Wilson*, 941 N.W.2d 579, 591 (Iowa 2020) (finding substantial evidence to prove lack of justification where defendant started the confrontation); *State v. Jenkins*, No. 21-1718, 2023 WL 4759448, at *7 (Iowa Ct. App. July 26, 2023) ("[S]ubstantial evidence[ ] shows that Jenkins 'escalated the level of force beyond what was reasonable under the circumstances.'" (citation omitted)). In reviewing the use of deadly force, we have stated that lethal force relied on without any indication of a threat of death is not

---

[2] The other elements were:
(1) . . . [Russell] struck . . . McLeod.
(2) . . . McLeod died as a result of being struck.
(3) [Russell] acted with malice aforethought.
(4) [Russell] acted willfully, deliberately, premeditatedly and with a specific intent to kill . . . McLeod.

justified. *See State v. Bowers*, No. 18-1827, 2020 WL 1310290, at *2–3 (Iowa Ct. App. Mar. 18, 2020) (pointing to the use of lethal force without any indication of danger as bringing "a knife to a fistfight" and negating a defense of justification (citation omitted)). Similarly, our supreme court has held that once a victim is disarmed, there is no longer any justification for the use of force. *State v. Campbell*, 214 N.W.2d 195, 197 (Iowa 1974) ("Once [the victim] had been disarmed, there was no longer any threat of harm to defendant. There was no reason for him to strike [the victim], especially in the brutal manner he did . . . ").

Here, there is substantial evidence that Russell did not act with justification because he instigated the physical altercation and escalated it. Similarly, there is no dispute that Russell disarmed McLeod but then continued beating her, even after she fell to the ground, and thus, Russell also continued the altercation. When McLeod raised the golf club over her shoulder, she was not within striking distance of Russell, and McKinley was standing in between her and Russell; he had to push McKinley out of the way to reach McLeod. And, importantly, the only weapon involved in this dispute was that golf club, which Russell quickly took away from McLeod before she ever hit him with it. At that point, there was no threat of danger; but rather than ending the conflict, Russell escalated the situation to one of a physical assault causing the head of the golf club to come off and then shoving the shaft of the golf club into McLeod's mouth and through the back of her skull. Even as she was choking on her own blood, Russell carried on with the attack.

The fact that Russell was without visible injury while—according to the autopsy results—McLeod suffered at least fourteen blows and a ring from the shaft of the golf club was lodged inside of McLeod's skull clearly establishes how

unreasonable Russell's use of force was. Although Russell claims that McLeod threatened his life, the jury was able to assess that claim and discount it because Russell said he felt disrespected but not afraid. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (noting the jury is free to believe or disbelieve the evidence and to give weight to the evidence as it sees fit). Even with Russell's comment that McLeod slung insults at him to start the fight and that she tried to swing the golf club towards him, there was substantial evidence that Russell did not act in self-defense and that there was not a reasonable basis to justify Russell's use of deadly force.

## IV. Conclusion.

Russell instigated the altercation by hitting McLeod first, escalated it, and then continued it after McLeod was unarmed, ultimately resulting in McLeod's death. For these reasons, we find substantial evidence supports the verdict, and we affirm.

**AFFIRMED.**